**EAST TENNESSEE NATURAL GAS COMPANY, Petitioner,**

v.

**FEDERAL ENERGY REGULATORY COMMISSION, Respondent.**

No. 87–1765.

United States Court of Appeals, District of Columbia Circuit.

Argued Oct. 14, 1988.

Decided Dec. 9, 1988.

James T. McManus, with whom Maria M. Jackson, Washington, D.C., and Thomas E. Midyett, Jr., Knoxville, Tenn., were on the brief, for petitioner. Terence J. Collins, Washington, D.C., also entered an appearance for petitioner.

Dwight C. Alpern, Attorney, F.E.R.C., with whom Catherine C. Cook, Gen. Counsel, and Jerome M. Feit, Sol., F.E.R.C., Washington, D.C., were on the brief, for respondent.

Glenn W. Letham and Kenneth M. Albert, Washington, D.C., were on the brief, for intervenor.

Before WALD, Chief Judge, and MIKVA and SENTELLE, Circuit Judges.

Opinion for the court filed by Chief Judge WALD.

WALD, Chief Judge:

Petitioner East Tennessee Natural Gas Company ("East Tennessee") seeks review of an order of the Federal Energy Regulatory Commission ("FERC") requiring East Tennessee to eliminate its minimum commodity bill from its partial requirements rate schedule. We find substantial evidence to support the Commission's determination that the bill is unjust and unreasonable.

East Tennessee's petition raises the further question of whether FERC can order the elimination of the minimum bill retroactively to the effective date of the pipeline's most recent rate filing although the pipeline itself proposed no change in the bill at that time. To answer that question, we reexamine §§ 4 and 5 of the Natural Gas Act, 15 U.S.C.A. §§ 717–717w (1976), as they relate to changes ordered by FERC in

existing rates because of their interaction with changes proposed in the pipeline's filing. We determine that the FERC-ordered changes in East Tennessee's minimum bill did not come within the Commission's § 4 retroactivity authority. Consequently, we reverse the retroactive application of the Commission's order eliminating the minimum commodity bill.

## I. BACKGROUND

### A. *Factual Context*

East Tennessee operates a natural gas pipeline system in Tennessee and Virginia. Although most of East Tennessee's customers are full requirements customers who purchase natural gas solely from East Tennessee, two[1] of its customers are partial requirements customers who can choose to purchase gas either from East Tennessee or from alternative suppliers.[2] The service provided to East Tennessee's partial requirements customers is known as "firm sales service". Under this service, partial requirements customers are entitled to purchase on demand a designated quantity of gas over a certain period of time.

To provide this firm service, East Tennessee incurs both fixed and variable costs. Fixed costs are those costs that do not vary with the amount of gas that East Tennessee actually sells.[3] They include not only up-front expenditures in making investments, but also an approved return on such investments (equity return) and related taxes. Variable costs, on the other hand, are those costs that do vary with the quantity of gas sold; the principle source of variable cost is the cost of gas purchased by East Tennessee for delivery to its customers. The essential difference between the two kinds of costs from East Tennessee's point of view is that once it incurs fixed costs, it

risks not recovering these costs unless it sells gas; variable costs on the other hand are risk-free: if East Tennessee does not sell gas, it incurs no such costs. The issue in this case involves East Tennessee's attempt to recover through a minimum bill some fixed costs of providing firm sales service to partial requirement customers.

Historically, East Tennessee's fixed costs have been recovered in two ways. First, it has charged its partial requirements customers a demand charge: a flat charge which is based on the entitlement reserved but collected regardless of the quantity of gas actually purchased by the customer. Second, East Tennessee has a per-unit charge, known as a commodity charge, which is collected for each unit of gas actually sold to a customer. In designing rates, East Tennessee adds up the fixed costs of reserving an entitlement quantity for a customer and then collects part of that total through the demand charge and part through the commodity charge.

The demand charge guarantees that the fixed costs allocated to it will be recovered regardless of how much gas East Tennessee actually sells. The fixed costs allocated to the commodity charge, however, are only recovered to the extent that sales are made. Historically, East Tennessee has protected itself from underrecovery of the portion of fixed costs allocated to the commodity charge by including a minimum bill requirement in its partial requirements rate schedule. The minimum bill obligates a customer to pay the commodity charge for 60% of its entitlement whether or not that quantity of gas is actually purchased. The minimum bill thus guarantees further recovery of fixed costs.

### B. *Procedural History*

These proceedings were initiated when East Tennessee filed under § 4 of the Nat-

---

1. Subsequent to the events in this case, East Tennessee added a third partial requirements customer. Brief for Respondent at 3.

2. One of these customers, Chattanooga Gas Co., filed an appearance as intervenor. Both Chattanooga and the other partial requirements customer, Roanoke Gas Company, appeared in the proceedings before the Commission.

3. Fixed costs can vary with the amount of gas that East Tennessee *expects* to sell based on the entitlements reserved. That is, in making decisions about how much capacity to build, East Tennessee looks to entitlements to estimate how much capacity it might need in the future.

ural Gas Act, 15 U.S.C.A. § 717c (1976), to revise its rates.[4] Section 4 requires that FERC find proposed changes in pipeline rates to be just and reasonable. Among the changes proposed by East Tennessee was a change in its rate design. Prior to the filing, East Tennessee had been using what is known as the *United*[5] rate design, which allocates 25% of fixed costs to the demand charge and the remaining 75% to the commodity charge. In its filing, East Tennessee proposed to change to the *Seaboard*[6] method which allocates 50% of fixed costs to the demand charge and 50% to the commodity charge. East Tennessee proposed no changes to its minimum bill provision. During its review of the filing, FERC opposed East Tennessee's rate design proposal and raised questions on its own initiative about the lawfulness of the minimum bill provision in East Tennessee's partial requirements rate.[7]

On April 6, 1984, East Tennessee filed and the Commission accepted a settlement agreement (the "1984 settlement"), Joint Appendix ("J.A.") at 29–55, which resolved most issues raised by the filing but reserved for hearing both the rate design and the minimum bill issues. This agreement contained a provision which required that any changes in the minimum bill be made prospectively only from the date on which the Commission ordered such changes. A seminal provision of the agreement indicated that except for specified clauses (not including the minimum bill), the agreement was to expire at the time that East Tennessee's next general rate filing went into effect.

A hearing was held before an Administrative Law Judge ("ALJ") on January 17–18, 1984. At the time of the hearing, East Tennessee's minimum bill was a full-cost minimum bill, collecting both the variable cost and the fixed cost components of the commodity charge. Before the ALJ rendered his decision, however, FERC issued Order No. 380, *Elimination of Variable Costs From Certain Natural Gas Pipeline Minimum Commodity Bill Provisions*, 49 Fed.Reg. 22778 (June 1, 1984), which disallowed the collection of the variable cost portion of commodity charges through minimum bills. As a result of Order No. 380, East Tennessee's minimum bill was significantly reduced (variable costs constituted approximately 95% of the commodity charge, Brief for Respondent at 14) to become a fixed-cost only minimum bill.

In the initial decision, issued January 23, 1985, the ALJ rejected East Tennessee's proposal to switch to the *Seaboard* method of rate design. The ALJ found instead that the method proposed by the staff of the Commission, the modified fixed-variable design ("MFV"), was just and reasonable and ordered East Tennessee to adopt this method prospectively. J.A. at 67–68. This method of rate design allocates all fixed costs to the demand charge except for that portion which represents a return on equity, related income taxes and fixed production costs. J.A. 135. The ALJ also found East Tennessee's minimum bill to be unjust and unreasonable[8] and ordered that it be eliminated, again prospectively from the date of the order. J.A. at 60–61. East Tennessee appealed both of these determinations to the Commission.

Before the Commission issued its decision, East Tennessee made another general rate filing on May 31, 1985, to become

---

**4.** East Tennessee made three filings dealings with a wide variety of rate issues. The first two were made on April 30, 1981, East Tennessee, 15 F.E.R.C. ¶ 61,187 (1981); the last on July 30, 1982, East Tennessee, 20 F.E.R.C. ¶ 61,212, *reh'g denied*, 21 F.E.R.C. ¶ 61,139 (1982). The filings were later consolidated. *Id.*

**5.** United Gas Pipeline Co., 50 F.P.C. 1348 (1973), *reh'g denied*, 51 F.P.C. 1014 (1974), *aff'd sub nom. Consolidated Gas Supply Corp. v. F.P.C.*, 520 F.2d 1176 (D.C.Cir.1975).

**6.** Atlantic Seaboard Corp., 11 F.P.C. 43 (1952).

**7.** It should be noted that the term "rate" is used generally throughout this opinion to refer to all features of a rate schedule including methods of cost allocation, charges, restrictions on who may use a particular rate, and other features such as minimum bills.

**8.** The grounds for this determination differed from those ultimately relied on by the Commission and are no longer relevant.

effective July 1, 1985. In this filing East Tennessee proposed to use the MFV rate design but again proposed no changes to its minimum bill. The Commission suspended the proposals until December 1, 1985, and set the case for hearing. *East Tennessee*, 31 F.E.R.C. ¶ 61,383 (1985), *reh'g denied*, 32 F.E.R.C. ¶ 61,456 (1985). Subsequently East Tennessee tendered another settlement agreement (the "1985 settlement") which preserved the MFV proposal, continued to reserve the minimum bill issue for hearing and again provided that any change in the minimum bill would be made prospectively only. J.A. at 180–99. On April 25, 1986, the Commission approved the 1985 settlement in all respects except for the provision regarding the effective date of changes to the minimum bill. *East Tennessee*, 35 F.E.R.C. ¶ 61,113 (1986). The Commission ordered all changes, including the proposed switch to the MFV rate design and elimination of the minimum bill, to be effective retroactively to December 1, 1985. East Tennessee did not accept this modification, withdrew the 1985 settlement and filed yet another settlement on December 30, 1986 (the "1986 settlement"), which duplicated the 1985 settlement but provided that the effective date for eliminating the minimum bill would also be reserved for hearing. (J.A. at 223–52.)

On August 21, 1987, the Commission issued its Opinion No. 282, *East Tennessee*, 40 F.E.R.C. ¶ 61,201 (1987) (the order on review in the instant case), in which it approved the 1986 settlement, affirmed the ALJ's determination that East Tennessee's minimum bill was unjust and unreasonable and made an additional determination that the minimum bill was to be eliminated retroactively to December 1, 1985, as an exercise of FERC's remedial powers under § 4 of the Natural Gas Act. Rehearing was denied on December 2, 1987. *East Tennessee*, 41 F.E.R.C. ¶ 61,271 (1987).

## II. ISSUES ON APPEAL

East Tennessee raises three issues on appeal. First, it contends that the Commission improperly placed the burden of proof on East Tennessee to demonstrate the lawfulness of the minimum bill. Second, it contends that the Commission's decision to eliminate the minimum bill was not based on substantial evidence. Finally, East Tennessee argues that the Commission did not have authority to order retroactive elimination of the minimum bill. Our review of each of these issues is limited to a determination of whether or not FERC has acted in a manner which is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C.A. § 706(2)(A) (1977). In this connection we note that

> [a]lthough 15 U.S.C. § 717r(b) specifies that 'the findings of the Commission as to the facts, if supported by substantial evidence, shall be conclusive,' ... this is no more than a recitation of the application of the 'arbitrary and capricious' standard to factual findings.

*Maryland People's Counsel v. FERC*, 761 F.2d 768, 774 (D.C.Cir.1985).

### A. Burden of Proof

■ The Natural Gas Act allocates the burden of proving that a rate change is just and reasonable according to the source of the proposed change. *See Tennessee Gas Pipeline Co. v. FERC*, 860 F.2d 446, 449 (D.C.Cir.1988); *Sea Robin Pipeline Co. v. FERC*, 795 F.2d 182, 183–184 (D.C.Cir. 1986); *ANR Pipeline Co. v. FERC*, 771 F.2d 507, 513–14 (D.C.Cir.1985). The pipeline thus bears the burden of proving that any changes it proposes to make in existing rates are just and reasonable. When review of existing rates is initiated by the Commission, however, the burden of proving that the existing rates are unjust or unreasonable, and that those it orders in replacement are just and reasonable, rests with FERC.

■ In its filing, East Tennessee made no proposal to change its existing minimum bill provision. Consequently, the Commission bore the burden of proving that the minimum bill was unlawful. The Commission explicitly assumed this burden of proof. 40 F.E.R.C. at 61,671. However, in reliance on the procedure adopted in an

earlier decision, *Transwestern Pipeline Co.,* 32 F.E.R.C. ¶ 61,009 (July 1, 1985), *reh'g denied* 36 F.E.R.C. ¶ 61,175 (August 4, 1986), *aff'd,* 820 F.2d 733 (5th Cir.1987), *cert. denied,* — U.S. —, 108 S.Ct. 696, 98 L.Ed.2d 648 (1988), the Commission structured the burden so as to require that FERC make a showing that the minimum bill was *prima facie* anticompetitive and therefore *prima facie* unlawful; such a showing would then shift to East Tennessee the burden of producing evidence to justify the minimum bill. The Commission stated that despite this shift, FERC nonetheless retained the ultimate burden of persuasion. The Commission also announced that in future cases involving the review of minimum bills it would apply a presumption of anticompetitiveness, thereby relieving FERC of the obligation to make an initial showing of unlawfulness before the burden of producing justifications would be shifted to the pipeline. 40 F.E.R.C. at 61,-674. The ultimate burden of showing unlawfulness would, however, remain with the Commission.

East Tennessee argues that the Commission failed to adhere to this procedure, and effectively placed on the pipeline the burden of proving the reasonableness of its minimum bill. We do not agree. In its opinion, the Commission discussed the rationale for its determination that in the future it would apply a presumption that minimum bills were anticompetitive. *Id.* at 61,673–74. This rationale was relevant to showing the anticompetitiveness of East Tennessee's minimum bill as well. In addition, the Commission cited record evidence regarding the effect of the minimum bill on East Tennessee's two partial requirements customers and concluded that the minimum bill was "on its face ... unduly discriminatory." *Id.* at 61,674. The Commission then examined the justifications offered by East Tennessee in support of the minimum bill,[9] and set out its reasons for rejecting them. We find that the Commission followed a correct procedural route in under-

taking its burden of proving that the bill was unreasonable.

### B. *Substantial Evidence*

■ As a substantive matter, the Commission must, of course, find that the minimum bill is unlawful based on substantial evidence. 15 U.S.C.A. § 717r(b) (1976). We hold that the Commission's finding to that effect in this case is so supported.

The Commission made its initial showing that the minimum bill was *prima facie* anticompetitive on the basis of extensive testimony by one of East Tennessee's two partial requirements customers, Chattanooga Gas Company ("Chattanooga"). *See* J.A. at 5–9; 171–177. This testimony indicated that as a result of falling demand for natural gas from Chattanooga's customers, Chattanooga had experienced a reduction in load factor (the quantity of gas delivered as a percentage of the reserved entitlement) to about 49%. J.A. at 173; 177. Since East Tennessee's minimum bill required payment of commodity charges for 60% of Chattanooga's entitlement, switching to an alternative supplier would have required paying both this supplier's commodity charge and East Tennessee's. Chattanooga testified that as a result it refrained from switching to an alternative, lower-cost supplier. J.A. at 6–7; 174.

■ East Tennessee argues that Chattanooga's testimony does not constitute substantial evidence because it relates to the effect of the *full-cost* (fixed plus variable cost) minimum bill East Tennessee had in place prior to the Commission's rulemaking in Order No. 380. The minimum bill at issue in this proceeding, however, was a *fixed-cost* minimum bill. This fact is not, however, fatal to the Commission's case. Chattanooga's testimony about the effects of the full-cost minimum bill constitutes substantial evidence supporting the Commission's *prediction* that the fixed-cost minimum bill will also produce anticompetitive results. Making such predictions is clearly within the Commission's expertise,

9. Most of these justifications were derived from a venerable FERC opinion which sets out several acceptable rationales for minimum bills. *At-*

*lantic Seaboard Corp.,* 38 F.P.C. 91 (1967), *aff'd,* 404 F.2d 1268 (D.C.Cir.1968).

*see Associated Gas Distributors v. FERC,* 824 F.2d 981, 1008 (D.C.Cir.1987), *cert. denied sub nom. Interstate Natural Gas Association v. FERC,* — U.S. —, 108 S.Ct. 1468, 99 L.Ed.2d 698 (1988), and we find that its prediction here is rationally based on record evidence.

The basic economic argument relied on by the Commission in making its anticompetitive-effect prediction about fixed-cost minimum bills is that when a customer's deliveries drop below a supplier's minimum bill requirement (60% of the entitlement), as Chattanooga's did due to falling demand, the minimum bill artificially causes the price paid for an additional unit of gas (the "incremental price") to reflect no commodity charges; the supplier's minimum bill collects these charges regardless of whether the unit is taken or not. This artificially low incremental price causes a distortion in a customer's decisions about where to purchase gas, biasing purchases towards this supplier even if an alternative supplier's price is lower than East Tennessee's. To compete with East Tennessee under these conditions, an alternative supplier must effectively eliminate its own commodity charge from its price, even though it has no minimum bill with which to recoup this charge. The Commission reasonably predicted that this anticompetitive effect testified to by Chattanooga would arise regardless of the size of the minimum bill so long as demand for natural gas was falling. Having found that demand was indeed falling, the Commission's conclusion that the minimum bill was *prima facie* anticompetitive was supported both by substantial evidence and a prediction based on legitimate economic reasoning.[10]

We also find that FERC carried its ultimate burden of proof as to the unlawfulness of East Tennessee's minimum bill in light of East Tennessee's proposed justifications.

The Commission considered three justifications originally set out in *Atlantic Seaboard, supra,* which East Tennessee raised in defense of its minimum bill. It warned that, "[a]s the courts have cautioned, the minimum bill must be specifically designed to remedy one of those difficulties and nothing more." 40 F.E.R.C. at 61,674 (citing *Mississippi River Transmission Corp. v. FERC,* 759 F.2d 945 (D.C.Cir.1985)). We consider these justifications in turn.

The first *Seaboard* justification is designed to protect the company from underrecovering its fixed costs. The Commission noted here that under East Tennessee's modified fixed-variable rate design approved in the 1986 settlement, the only fixed costs at risk are those attributable to the equity return on pipeline investments, related income taxes and fixed production costs. This is because the MFV rate design allocates all other fixed costs to the demand charge, a guaranteed source of revenue. J.A. 135. The Commission concluded, as it had in *Transwestern, supra,* and *Texas Eastern Transmission Co.,* 30 F.E.R.C. ¶ 61,144 (1985), that, as a matter of policy, East Tennessee should not be guaranteed recovery of the remaining fixed costs attributable to equity return, related taxes and fixed production costs; placing these costs at risk, the Commission found, would give East Tennessee a stronger incentive to compete for sales and reduce costs in order to earn a profit. J.A. 135.

East Tennessee argues that this "policy" judgment does not constitute substantial evidence for rejecting the first justification. We think otherwise. FERC's adoption of an "incentive theory," that exposure of the fixed costs attributable to a return on equity will improve the competitiveness of the natural gas industry, is a judgment well within its discretion in deciding what is a just and reasonable rate. *See Associated Gas Distributors, supra* at 1008–09 (agencies do not need to conduct experiments in order to rely on reasonable

---

**10.** East Tennessee's argument that this circuit's opinion in *Columbia Gas Transmission Co. v. FERC,* 628 F.2d 578 (D.C.Cir.1979), prevents the use of "general principles" misunderstands that opinion. The flaw found in *Columbia* was that

FERC had *failed* to present the economic reasoning supporting its general principle. 628 F.2d at 588 n. 47. *See also Associated Gas, supra.*

economic propositions). Having guaranteed through the demand charge that East Tennessee will recover its out-of-pocket costs in building facilities and making other investments, it was entirely reasonable for FERC to decide that

> [i]f equity return and associated taxes are included in the commodity component to be recovered over annual throughput, [the] pipeline will earn profits only when its [sic] makes sales and transports gas.... This ... holds the pipeline responsible for its management decisions and provides the necessary incentive to [the pipeline] to purchase gas both at the quantity and the price demanded by its customers.

40 F.E.R.C. at 61,686 n. 34 (quoting *Texas Eastern Transmission Co.,* 30 F.E.R.C. ¶ 61,144 at 61,283 (1985)).

East Tennessee does not contend that as a result of this policy judgment it will in fact be deprived of the opportunity to earn a reasonable return on its investments; in the absence of any indication that East Tennessee will not be able to compete for sales effectively, and thus earn a competitive rate of return, there is nothing unreasonable about the Commission's judgment that exposing equity return to risk will in fact promote the recovery of competitive, and only competitive, profits. Moreover, the *Seaboard* case which established recovery of fixed costs as a *potential* justification for minimum bills clearly does not stand for the proposition that minimum bills are *necessarily* justified whenever they contain any fixed cost element:

> The point is ... that a policy favoring effective competition necessarily brings with it the reality of economic pinch, present or threatened ... the hard problem then is not whether competition may hurt but rather where and how to draw the lines of acceptable range of competition and hurt, in response to the economic characteristics and interrelationships of the industry that require regulation in the first place.

*Atlantic Seaboard Corp. v. FERC,* 404 F.2d 1268, 1272–73 (D.C.Cir.1968). The Commission's rejection of the first *Sea-*board factor in East Tennessee's case was neither arbitrary nor capricious.

The Commission also rejected the second *Seaboard* justification that the minimum bill was necessary to prevent cost-shifting from partial requirements customers to full requirements customers. The basis for this justification is that to the extent partial requirements customers reduce their purchases (entitlements or actual purchases) when they switch suppliers, uncollected fixed costs may have to be collected from full requirements customers who do not have the option of shifting to alternative suppliers. The Commission concluded that any such effect in East Tennessee's case was not sufficient to justify the minimum bill. The Commission reiterated that with the MFV rate design, any drop in commodity charges collected from partial requirements customers would not result in underrecovery of any fixed costs that East Tennessee is now *entitled* to recover. As for possibly reduced collection of demand charges, the Commission made the prediction that, faced with the need to compete more effectively in order to recover its costs, East Tennessee will take steps to reduce costs to attract new customers or retain its present ones. Additionally, the Commission stated that any residual shifting which might occur will be balanced by the benefits to all customers resulting from the creation of incentives for East Tennessee to behave more competitively. All of these answers are consistent with the original *Seaboard* rationale:

> The extent of this impact [cost-shifting] will vary depending on innumerable factors, the very reason why the determination of standards is properly for the Commission in the exercise of its regulatory expertise and not for the courts.

404 F.2d at 1272. In short, the Commission proffered reasonable arguments for rejecting the second *Seaboard* justification.

The third and final *Seaboard* factor concerns the possible need for a minimum bill to ensure that any costs arising from the pipeline's own minimum bill obligations are collected from the customers responsible for a drop in demand. East Tennessee incurs costs when demand falls and it fails

to purchase minimum quantities from its supplier.[11]

The Commission found that East Tennessee's minimum bill was not necessary to protect the pipeline from incurring these costs without compensation. It found that "any minimum commodity bill payments to Tennessee would be treated as a gas supply cost and, if prudently incurred," would be included in East Tennessee's rates to its own customers directly through a mechanism known as the purchased gas adjustment clause. 40 F.E.R.C. at 61,686 n. 40. Moreover, the Commission stated that there was "no necessary connection between the costs the pipeline could recover from [partial] requirements customers reducing their purchases] and [its own] minimum bill payments." *Id.* at 61,-676. It is within the Commission's discretion to require that the minimum bill be designed to reasonably reflect the relationship between East Tennessee's customers' purchases and its obligations to purchase minimum quantities from Tennessee. This minimum bill collected arbitrary amounts from customers as regards East Tennessee's own minimum bill obligations, and thus the Commission's rejection of the third *Seaboard* justification was a legitimate exercise of its judgment.

In sum, we hold that the Commission has acted reasonably and on the basis of substantial evidence in finding that East Tennessee's minimum bill is unlawful.

C. *The Scope of § 4 Retroactivity*

Having found East Tennessee's minimum bill to be unlawful, the Commission then required East Tennessee to eliminate the bill retroactively to December 1, 1985, the date at which East Tennessee's § 4 proposal to switch to the MFV rate design went into effect.[12] At the outset we reject East Tennessee' argument that the Commission is bound by the 1984 settlement agreement to require elimination of the minimum bill prospectively only. The 1984 settlement agreement expired by its own terms when East Tennessee made its general rate filing on May 31, 1985. The agreement plainly made no exception from that cut-off for the minimum bill provision although it did so for a number of other provisions. *See* J.A. at 47. Accordingly, we go on to determine whether or not the Commission acted within its authority under the Natural Gas Act in ordering retroactive elimination of the minimum bill.

The Natural Gas Act, 15 U.S.C. A. §§ 717–717w (1976), and the limited authority it provides for retroactive rate changes, must be interpreted in light of the Act's well-understood approach to regulation. Rates for the sale and transportation of natural gas are set in the first instance by pipelines; regulation by FERC extends only to reviewing proposed rates the pipeline wishes to put into effect and existing rates already on file that the Commission believes to be unjust or unreasonable. The Commission may itself prescribe remedial rates only when proposed or existing rates are found to be unlawful. *United Gas Pipe Line Co. v. Mobile Gas Service Corp.,* 350 U.S. 332, 341, 76 S.Ct. 373, 379, 100 L.Ed. 373 (1956). This regulatory approach is summarized in the filed rate doctrine, *see Arkansas Louisiana Gas Co. v. Hall,* 453 U.S. 571, 577–78, 101 S.Ct. 2925, 2930–31, 69 L.Ed.2d 856 (1981), which requires that pipelines charge only those rates that the Commission has permitted to go into effect.[13]

Retroactive changes in rates violate the filed rate doctrine, by allowing the collection of rates other than the ones that were on file at the time of purchase, and, *as a general rule,* are not authorized by the Natural Gas Act. *Id.* at 578, 101 S.Ct. at 2930–31. Existing filed rates which the Commission finds to be unrea-

---

11. East Tennessee, it should be noted, purchases 98% of its natural gas from Tennessee Gas Pipeline Co., a subsidiary of East Tennessee's own parent corporation, Tenneco Inc. Brief for Respondent at 3.

12. This proposal was made on May 31, 1985. *See* discussion at 936, *supra.*

13. The fact that a rate is filed does not necessarily mean, as we shall see, that the rate has been finally *approved* by the Commission.

sonable can, under § 5, be remedied only prospectively. Proposed rate changes under § 4 are ideally approved by the Commission as being just and reasonable *before* they become filed rates.

The only statutory exception to the rule prohibiting retroactive rate changes arises in order to accommodate the realities of administrative delay. When a pipeline proposes rate changes under § 4, the Commission is authorized by the Act to suspend the rates for five months pending administrative review. 15 U.S.C.A. § 717c(e) (1976). If the Commission is unable to determine whether or not the proposals are just and reasonable within that time limit, however, the pipeline is permitted to collect the proposed rates on a temporary basis. That is, the proposed rates may become effective *filed* rates before final approval by the Commission. If the Commission ultimately determines, however, that the rates are *not* just and reasonable, then § 4 authorizes the Commission to order that the pipeline pay refunds to any customers who purchased gas at the (filed) proposed rate, thereby retroactively changing that rate. Allowing these retroactive reductions in filed rates is a necessary compromise to accommodate delays in the approval process and is done at the pipeline's risk; in essence, the pipeline forgoes its ordinary entitlement to rely on filed rates when it chooses to go ahead and collect rates that have not yet been finally approved.

In eliminating East Tennessee's minimum bill retroactively, the Commission here relied on our holding in *Cities of Batavia, Naperville, Etc. v. FERC*, 672 F.2d 64 (D.C.Cir.1982) which, according to FERC's interpretation, extended § 4's normal administrative delay exception to include retroactive changes to existing filed rate components the Commission finds unlawful but that are *not* the subject of the pipeline's proposed changes *whenever* those existing rate components interact with the pipeline's proposed changes. We,

however, find this interpretation of *Batavia* to be an overly expansive one as regards the scope of the § 4 exception to the filed rate doctrine. Under the more limited interpretation of *Batavia* we adopt today, we reverse that portion of the Commission's order that makes the elimination of the minimum bill retroactive.

In *Batavia* we ruled that § 4 authority [14] extended to permit retroactive adjustments not only to proposed rate changes which had been allowed to go into effect pending approval, but also to some existing rate components that the pipeline had not proposed to change but which the Commission found could not coexist with proposed changes without producing an unjust or unreasonable rate. 672 F.2d at 76–77. We stated that the unlawful result must arise from the interaction between proposed and existing rate components:

> The Commission [is not precluded] from reviewing a revised rate completely to assure that all its parts—old and new— operate in tandem to insure a 'just and reasonable' result and from ordering refunds if [an existing part of the rate] operates with new provisions to provide an over-recovery.

*Id.* at 77. *Batavia*'s interpretation of the scope of § 4 was intended to further the regulatory thrust of the Natural Gas Act by ensuring that *any* unjust or unreasonable effect of proposed changes made effective pending administrative review is ultimately rectified. However, the *Batavia* interpretation of § 4 was *not* designed to undermine the basic principle that pipelines are entitled to rely on filed rates. Only when proposed changes cannot be implemented without interacting with existing components so as to produce what the pipeline *should itself have recognized* as an unjust and unreasonable result can the pipeline be essentially held to forego its reliance interest in those existing rate components.[15]

---

**14.** *Batavia* specifically analyzed FERC's authority under § 205 of the Federal Power Act, 16 U.S.C.A. § 824d. Interpretations of this section apply equally to § 4 of the Natural Gas Act. *See* n. 21, *infra.*

**15.** Of course, we do not intend to make the contours of § 4 retroactivity authority turn on the pipeline's ability to predict what the Commission may in the future decide is unjust and unreasonable. As we explain below, the *Bata-*

The Commission, however, has interpreted *Batavia* too broadly as an exception to § 5 restrictions on retroactive rate-making by the Commission. We intended *Batavia* to have only the narrow effect set out above. In this regard, however, we note that FERC cited in its *East Tennessee* order another circuit's interpretation which also gave *Batavia* a broad reading. 40 F.E.R.C. at 61,684. Thus at least part of the responsibility may indeed rest with us. In *Colorado Interstate Gas Co. v. FERC,* 791 F.2d 803 (10th Cir.1986), *cert. denied,* 479 U.S. 1043, 107 S.Ct. 907, 93 L.Ed.2d 857 (1987), the Tenth Circuit stated *Batavia* meant that

> by filing the rate increase, a gas company assumes the risk of having to justify *its entire rate structure, including integral provisions of that structure which the company does not propose to change.*

791 F.2d at 807 (citations omitted) (emphasis added). The court in *Colorado* approved the retroactive elimination of a minimum bill based on this broad reading.[16] We again stress that such a broad incursion on the general rule prohibiting retroactive changes in rates is not, in our opinion, justified by § 4 or the *Batavia* exception. We clarify today our holding that a pipeline does *not* abandon its reliance interest in filed rates simply because it institutes a § 4 proceeding. An interaction between proposed changes and existing rates does not open the door to any and all retroactive changes in existing rates. Only where the interaction will *create* results that are unjust or unreasonable under *existing* Commission policy as it applies to the pipeline at the time it files its proposed rate changes does the pipeline forego that reliance interest and invite retroactive changes to existing rates.

This narrower interpretation of *Batavia* is, indeed, the only one compatible with a later decision in this circuit, *Sea Robin*

*Pipeline Co. v. FERC,* 795 F.2d 182 (D.C. Cir.1986), which explicitly stated that *Batavia* "neither contradicts nor limits" its holding. *Id.* at 187.

In *Sea Robin,* the pipeline had proposed a rate increase under § 4 to reflect increased cost of service; the pipeline made no proposal to change the rate charged to one particular customer who, unlike other customers, had for almost a decade paid a fixed (not cost-based) rate. The Commission, however, undertook an inquiry into the practice of treating the fixed-rate customer differently from others, and ultimately required its retroactive elimination.

On review, the court held that the Commission bore the burden of proof as to any unreasonableness of the customer's special rate treatment. 795 F.2d at 187. Since the court went on to find that the Commission had not borne that burden, *id.,* it did not have to rule on the question of whether or not changes in the customer's rate treatment could be ordered retroactively; the court nonetheless opined that changes in the rate treatment could be ordered prospectively only. *Id.* at 187, 189 n. 7. In stating that its analysis was consistent with *Batavia*'s interpretation of the exception for retroactive changes in existing rates (the unlawfulness of which must always be proved by the Commission whether under § 4 or § 5, *see Tennessee Gas Pipeline Co. v. FERC,* 860 F.2d 446 (D.C. Cir.1988)), however, the court in *Sea Robin* must implicitly have found the customer's rate treatment not to come within *Batavia*'s exception. And indeed this would appear to be the case. The pipeline in *Sea Robin* had charged the fixed-rate to one customer for nearly a decade; thus existing Commission policy approved the use of a non-cost-based rate for this customer and the fixed rate, of course, would not have automatically reflected changes in the cost of service. The court in *Sea Robin* recog-

---

*via* exception cannot extend to an as yet unannounced change in Commission policy about what is unjust or unreasonable regardless of how foreseeable a change might be.

**16.** Opinions in other circuits reading *Batavia* similarly are cited in *Colorado. See Florida Gas*

*Transmission Co. v. FERC,* 741 F.2d 1307 (11th Cir.1984); *North Penn Gas Co. v. FERC,* 707 F.2d 763 (3d Cir.1983). *Laclede Gas Co. v. FERC,* 670 F.2d 38 (5th Cir.1982), decided contemporaneously with *Batavia,* appears to be in accord with our current interpretation.

nized as much when it noted that there was no evidence that the fixed rate did not in fact cover the cost of serving the fixed-rate customer (and therefore no evidence that the fixed-rate customer was unlawfully subsidized by other customers paying cost-based rates), *id.* at 189, and that in the absence of such evidence, the Commission's challenge was an attack on the long-standing practice of treating the fixed-rate customer differently than other customers. But as the court noted,

> Sea Robin had a right to rely on the legality of the filed rate [fixed-rate treatment] once the Commission allowed it to become effective. FERC may not order a retroactive refund based on a *post hoc determination of the illegality* of a filed rate's prescription.

795 F.2d at 189 n. 7 (emphasis added). The court's opinion recognized that the alleged unlawfulness of the rate treatment followed only from a *change* in existing Commission policy as it applied to Sea Robin. Thus we find *Sea Robin* to be fully reconcilable with our interpretation of *Batavia* as allowing § 4's retroactivity power to extend *only* to those changes in filed rates that the Commission orders so as to avoid interactions that create results that are unjust or unreasonable under existing Commission policy.

D.  *Retroactive Elimination of East Tennessee's Minimum Bill*

▉ Based on this more limited reading of *Batavia,* we reject the Commission's view that changes to East Tennessee's min-

imum bill came within the *Batavia* exception.

The Commission's determination that East Tennessee's minimum bill (an existing rate component the pipeline did not propose to change) was unlawful represented a change in Commission policy as it applied to East Tennessee. Prior to this case, East Tennessee had in fact been able to collect through its minimum bill fixed costs attributable to equity return, taxes and fixed production costs;[17] it is only on the basis of the Commission's new policy determination, insisting that equity return, taxes and fixed production costs be at risk in order to improve competition and finding that the second and third *Seaboard* justifications do not warrant departure from this principle, *see* discussion at 939–941, *supra,* that East Tennessee is forbidden to use its minimum bill to ensure recovery of these fixed costs.[18]

The Commission found that the minimum bill was "integral" to East Tennessee's switch to the MFV rate design based on its view that the MFV rate design *itself* represented a new policy (*proposed* by East Tennessee in its May 1985 filing) which, by interacting with the minimum bill to create an unlawful result, required the elimination of the minimum bill. We cannot agree.[19] The MFV rate design simply changed the allocation of fixed costs between East Tennessee's demand and commodity charges. The MFV rate design, by identifying equity return, taxes and fixed production costs separately and allocating these components alone to the commodity charge, *enabled* the Commission to put these fixed costs at

---

**17.** East Tennessee's prior rate design method did not identify fixed costs by type, and so did not separate out a component for equity return. Rather, the design allocated *total* fixed costs, including equity return, between demand and commodity charges on a percentage basis. *See* discussion at 936, *supra.*

**18.** In essence, the Commission has apparently found that the first *Seaboard* justification—guaranteeing recovery of fixed costs—can never alone justify a minimum bill which collects only equity return, taxes and fixed production costs under an MFV rate design. Indeed, the Commission also announced this general policy in *Transwestern Pipeline Co.,* 32 F.E.R.C. ¶ 61,009 (July 1, 1985), *reh'g denied,* 36 F.E.R.C. ¶ 61,175

(August 4, 1986), *aff'd,* 820 F.2d 733 (5th Cir. 1987), *cert. denied,* —— U.S. ——, 108 S.Ct. 696, 98 L.Ed.2d 648 (1988). We note, however, that East Tennessee's § 4 proposal to switch to the MFV rate design was made on May 31, 1985, *prior* to the Commission's announcement of its new general rule in *Transwestern.*

**19.** We are here concerned with the Commission's use of the term "integral" with respect to the authority of the Commission to order retroactive rate changes. We do not intend to suggest that in its review of the reasonableness of the minimum bill the Commission was not entitled to consider its interaction with the MFV rate design.

risk simply by eliminating the minimum bill. None of that changes the fact that it is the Commission's decision to eliminate partially-guaranteed recovery of these fixed costs and its additional rejection of the second and third *Seaboard* justifications for the bill, *not* the change in rate design, that brought about the demise of the minimum bill. This is then not a case in which an existing provision interacts with proposed changes so as to effect double recovery of costs that under existing policy a pipeline is entitled to recover only once. Neither did the interaction produce a rate of return to the pipeline over and above what was currently allowed at the time of the § 4 filing. Nor did it result in any discrimination among classes of customers that existing Commission policy did not condone. Changing East Tennessee's rate design did not require eliminating the minimum bill to avoid an interaction producing an unjust or unreasonable rate under Commission policy in place as of the time of the § 4 filing.

When East Tennessee proposed to alter its rate design, no policy forbade a partially-guaranteed recovery of equity return through a minimum bill. East Tennessee was entitled to rely on existing policy regarding the recovery of those fixed costs until the Commission changed that policy.[20] We hold that the Commission could not require the elimination of the minimum bill retroactively under *Batavia* because its unlawfulness did not stem from its interaction with the rate design proposal but rather from a new FERC policy which could be implemented only prospectively under § 5.[21]

### III. CONCLUSION

We conclude that FERC's determination that East Tennessee's minimum bill is unlawful is supported by substantial evidence and that in reaching this determination the Commission did not impermissibly shift the burden of proof to East Tennessee.

We also conclude that the elimination of the minimum bill did not fall within the narrow *Batavia* exception authorizing retroactivity for interactions between existing rate components and rate components a pipeline proposes to change that produce unlawful results. The *Batavia* exception cannot be invoked where the existing rate provision is held unlawful as a result of a change in Commission policy as it applies to the pipeline. Although East Tennessee's minimum bill did in fact interact with the new modified fixed-variable rate design so as to alter the role of the minimum bill in collecting fixed costs, it was a change in Commission policy and not the interaction that rendered the bill unlawful. Accordingly, we reverse that portion of the Commission's order that required East Tennessee to eliminate the minimum bill retroactively to the date at which East Tennessee's § 4 filing became effective.

---

**20.** East Tennessee's actual knowledge at an earlier point that the Commission intended to question the lawfulness of the minimum bill is not relevant to this analysis. East Tennessee was not obligated under the statute to assume the risk, however great the probability, that changes in the minimum bill might be ordered. Again we emphasize, however, that a pipeline is nonetheless bound by Commission policy announced either in a rulemaking or a previous adjudication (including adjudications in which the pipeline is not involved) where such policy is clearly a general one applying to the pipeline.

**21.** We note that since this case was briefed, Congress amended the Federal Power Act, 16 U.S.C.A. §§ 791a–825r, to allow FERC to order limited refunds in cases where the Commission or a complainant initiates review under § 206.

Regulatory Fairness Act, Pub.L. No. 100–473 (1983). § 206 was, prior to this amendment, "substantially identical," *F.P.C. v. Sierra Pacific Power Co.,* 350 U.S. 348, 353, 76 S.Ct. 368, 371, 100 L.Ed. 388 (1956), to § 5 of the Natural Gas Act and constructions of one were authoritative for the other, *Arkansas Louisiana Gas Co. v. Hall,* 453 U.S. 571, 577 n. 7, 101 S.Ct. 2925, 2930 n. 7, 69 L.Ed.2d 856 (1981). This amendment, designed to overcome the disincentive facing electric utilities to speed and settle § 206 cases, S.Rep. No. 100–491, 100th Cong., 2d Sess. 3–4 (1988), introduces a significant difference in the regulatory approaches of the Natural Gas Act and the Power Act. Our discussion here, then, must be understood to apply only to the Natural Gas Act.