877 F.2d 1066
 106 A.L.R.Fed. 847, 278 U.S.App.D.C. 278
 SOUTHERN NATURAL GAS COMPANY, Petitioner
v.
FEDERAL ENERGY REGULATORY COMMISSION, Respondent,
Texas Eastern Transmission Corporation, Atlanta Gas Light
Co., United Cities Gas Co., City of Albany, Georgia, Board
of Water, Gas & Light Commissioners, Chattanooga Gas Co.,
Columbia Nitrogen Corp., South Carolina Pipeline Corp.,
Georgia Industrial Group, Intervenors.
 No. 88-1110.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Dec. 9, 1988.
Decided June 30, 1989.
 
 James J. Flood, Jr., Washington, D.C., with whom William A. Major, Jr., Donna J. Bailey, Birmingham, Ala., and W. Perry Webb, Tuscaloosa, Ala., were on the brief, for petitioner.
 Robert H. Solomon, Atty., F.E.R.C., Washington, D.C., (FERC), for respondent. Catherine C. Cook, General Counsel, Joseph S. Davies, Deputy Sol., and John H. Conway, Atty., FERC, Washington, D.C., were on the brief, for respondent. Dwight Alpern, Atty., FERC, Washington, D.C., also entered an appearance, for respondent.
 
 
 1
 John E. Holtzinger, Jr. and John T. Stough, Jr., Washington, D.C., entered appearances for intervenor Atlanta Gas Light Co.
 
 
 2
 Jerry W. Amos, Greensboro, N.C., entered an appearance for intervenor United Cities Gas Co.
 
 
 3
 Robert B. Langstaff, Albany, Ga., entered an appearance for intervenor City of Albany, Ga., Bd. of Water, Gas and Light Com'rs.
 
 
 4
 Glenn W. Letham and Kenneth M. Albert, Washington, D.C., entered appearances for intervenor Chattanooga Gas Co.
 
 
 5
 Frederic G. Berner, Jr., Nancy Y. Gorman, Washington, D.C., and James L. Clegg entered appearance for intervenor Columbia Nitrogen Corp., et al.
 
 
 6
 Stanley M. Morley, Joel F. Zipp and Paul W. Diehl, Washington, D.C., entered appearances for intervenor South Carolina Pipeline Corp.
 
 
 7
 Edward J. Grenier, Jr., Washington, D.C., entered an appearance for intervenor Georgia Indus. Group.
 
 
 8
 Judy M. Johnson entered an appearance for intervenor Texas Eastern Transmission Corp.
 
 
 9
 Before WALD, Chief Judge, and EDWARDS and D.H. GINSBURG, Circuit Judges.
 
 
 10
 Opinion for the Court filed by Circuit Judge D.H. GINSBURG.
 
 D.H. GINSBURG, Circuit Judge:
 
 11
 Southern Natural Gas Company petitions for review of (1) an April 30, 1986 decision of the Federal Energy Regulatory Commission (FERC) (Decision I) rejecting certain aspects of filings submitted by Southern; and (2) FERC's December 17, 1987 decision (Decision II) denying Southern's petition for rehearing. We grant the requested relief in one respect, and otherwise dismiss or deny the petition for review.
 
 I. BACKGROUND
 
 12
 On March 31, 1986, Southern submitted for filing revised tariff sheets, which it proposed to be effective on May 1, 1986 and which called for "an annual overall increase in jurisdictional revenues of approximately $88 million." Southern based these revised tariffs, which it designated "Appendix A" to its transmittal letter, on the "modified fixed-variable" (MFV) rate design recently endorsed by FERC. See generally East Tennessee Natural Gas Co. v. FERC, 863 F.2d 932, 936 (D.C.Cir.1988). In addition to its Appendix A tariffs, Southern submitted "alternate revised tariff sheets" designated "Appendix B" to its transmittal letter. These Appendix B tariffs called for a $65 million rate increase, again based upon an MFV rate design, and contained, in addition, a minimum commodity bill--a device for fixed cost recovery that is currently out of favor with FERC, see id. at 935-40--the operation of which bill, Southern stated, would make possible the reduced nominal rate increase. In its filing, Southern stated that the Appendix B tariff sheets, "[i]f accepted by the Commission, are proposed to be effective on May 1, 1986 in lieu of the Appendix A tariff sheets," and that it had included Appendix B "as an alternative in order to allow the Appendix A rate change to be effective without a minimum commodity bill but without prejudice to Southern's position" in related proceedings that were then pending before the Court of Appeals for the Eleventh Circuit.
 
 
 13
 In both the primary and the alternative tariff, Southern also proposed to offer discounted ("Block II") rates to customers who purchased, at the regular ("Block I") price, volumes in excess of certain prescribed levels. Finally, as "Appendix C" to its transmittal letter, Southern filed tariff sheets for proposed transportation services, including proposed schedules of rates for eighteen specific customers.
 
 
 14
 In Decision I, FERC accepted for filing Southern's Appendix A tariff sheets. Finding that the proposed $88 million rate increase reflected therein "may be unjust, unreasonable, unduly discriminatory, or otherwise unlawful," however, FERC suspended the effectiveness of the rates for five months pursuant to Sec. 4(e) of the Natural Gas Act, 15 U.S.C. Sec. 717c(e), and set the matter for hearing before an Administrative Law Judge. FERC rejected Southern's Appendix B tariff filing on the ground that it did not, on its face, meet the standards required for implementation of a minimum bill.
 
 
 15
 In Decision I, FERC also rejected the proposed tariff sheet governing transportation service for Alabama Gas Company (Alagasco), one of the eighteen listed customers, stating that Southern had not obtained the necessary certificate authorizing the service. In Decision II, FERC acknowledged that this factual premise was inaccurate--Southern had in fact obtained the required certification--but pointed to an observation in Decision I that Southern's proposed transportation rates were not cost-based; on the basis of this statement, FERC adhered to its earlier determination.
 
 
 16
 Finally, FERC rejected, in Decision I, Southern's proposal to establish Block II incentive rates, holding that such rates would constitute a "new service," for which Southern would first have to obtain a certificate of public convenience pursuant to NGA Sec. 7(c). FERC also noted that the Block II rate was "not available to all sales customers on Southern's system, and may be unduly discriminatory and preferential under section 4 of the NGA." In Decision II, FERC reiterated these two reasons and added a third--viz., that Southern had not provided a cost basis for the disparity between the Block II rates and the undiscounted Block I rates.
 
 
 17
 In this petition for review, Southern claims that FERC erred when it rejected (1) that portion of Southern's proposed alternative tariff that called for a minimum commodity bill; (2) Southern's proposed tariff for a transportation agreement with Alagasco; and (3) that portion of Southern's proposed rate tariff that established incentive block rates for high volume purchases. We address each of these arguments in turn.
 
 II. THE MINIMUM BILL
 
 18
 On this appeal, Southern renews the claim in its petition for rehearing that FERC improperly "rejected the tariff sheets containing [the] proposed minimum bill without ... allowing [Southern] to place the proposed tariff sheets in effect subject to refund in accordance with Section 4(e) of the [Natural Gas] Act." Southern does not challenge, however, FERC's determinations (1) to accept Southern's primary Appendix A tariffs; (2) to set that matter for hearing; and (3) to permit the Appendix A tariffs to go into effect, after the five-month suspension period, subject to refund in the event that FERC ultimately finds the rate unlawful.
 
 
 19
 Given this procedural posture, Southern's claim to have been harmed is mystifying. Southern presented the two tariffs as mutually exclusive alternatives; they could not both go into effect by operation of NGA Sec. 4(e). The only conceivable way in which Southern could demonstrate harm, therefore, is on the theory that it had the right to file both tariffs and, at the end of the five-month suspension period, to choose for itself which set of tariffs would go into effect. Despite full briefing, oral argument, and post-argument briefs requested by the court, it is not clear whether Southern is or is not proceeding on this theory.
 
 
 20
 In any event, neither Sec. 4 of the NGA nor FERC's regulations confer a right to submit alternative filings and then to choose, at the end of the suspension period, which of the alternatives will go into effect pending the outcome of FERC's determination of the reasonableness of the filed rate. This issue has come before FERC in several prior cases. In Texas Eastern Transmission Corp., 22 FERC p 61,042 (1983), for example, the company submitted a primary filing based upon the so-called United type of rate design, along with five sets of alternative tariff sheets. The company stated that "when it is permitted to place its proposed increased rates into effect, it will move the Commission to put into effect one of the six sets of tariff sheets accompanying the filing," and that "[i]ts choice will depend on whether the Commission has issued an order ... which could require [it] to utilize the Seaboard rather than the United method of cost classification [and] ... on whether the Internal Revenue Service has issued a requested ruling [on an amortization issue]." Id. at 61,074.
 
 
 21
 FERC rejected Texas Eastern's proposal, and accepted for filing (and suspended) only the primary tariff sheets:
 
 
 22
 The sheets included in Alternates I through V are premised on events which have not yet occurred, and accordingly shall be rejected. This rejection of those sheets is without prejudice to Texas Eastern's right to seek modification of its filing in the future....
 
 
 23
 Id.
 
 
 24
 FERC reached the same result in a number of subsequent cases involving primary and alternative filings. In such cases, FERC's standard practice is to accept only one tariff for filing and to reject as "moot" or as "premature"--depending upon whether the event upon which any alternate tariff is predicated has or has not occurred--all alternative filings, without prejudice to the company's right to refile one of the alternatives in the event that the tariff accepted for filing is ultimately deemed unlawful. See, e.g., East Tennessee Natural Gas Co., 39 FERC p 61,369 at 62,203 (1987) (alternative filing "premature"); Trunkline Gas Co., 37 FERC p 61,201 at 61,485 (1986) (same); Transcontinental Gas Pipe Line Corp., 31 FERC p 61,129 at 61,267 (1985) (alternative filings "moot"). Cf. Eastern Shore Natural Gas Co., 43 FERC p 61,388 at 61,997 (1988) (accepting one set of alternative tariffs; rejecting primary filing as "moot"); Great Lakes Transmission Co., 36 FERC p 61,211 at 61,525 (1986) (same). In cases where the eventuality that the company sought to anticipate by filing alternative tariffs did in fact occur (most often by FERC's finding that some aspect of the primary filing was unjust and unreasonable), FERC has permitted an alternative tariff to be refiled. In so doing, it has, where appropriate, exercised its discretion to suspend the second tariff for only one day, rather than for the usual five months, in order to permit it to go into effect immediately. See, e.g., Trunkline Gas Co., 39 FERC p 61,234 at 61,818, 61,819 (1987).
 
 
 25
 Inexplicably, in this case, FERC did not rely upon its general policy of accepting only one filing at a time without prejudice to the company's right to refile an alternative in the event that the primary filing is found unlawful; instead it discussed the merits of Southern's alternative filing and made an affirmative determination that Southern had not met the standards required for implementation of a minimum bill. That FERC addressed Southern's minimum bill on its merits, however, does not necessarily mean that this court may do so.
 
 
 26
 Under Sec. 19(b) of the NGA, only a party "aggrieved by an order issued by the Commission ..." may seek judicial review thereof. 15 U.S.C. Sec. 717r(b). Because it was unclear to us how Southern could have been harmed in light of FERC's acceptance of its primary filing, we requested and received supplemental briefs addressed to that question. After reviewing those briefs, we are persuaded that Southern cannot have been aggrieved by FERC's rejection of its minimum bill in any way that is redressible by this court.
 
 
 27
 Southern specifically presented the minimum bill proposal to FERC as its second choice. Its first choice was the rate design reflected in its Appendix A tariffs, which FERC accepted and which went into effect after the five-month suspension period. Having received what it asked for, Southern cannot now complain that FERC acted arbitrarily in refusing to grant the relief it requested only in the alternative.
 
 
 28
 In its supplemental brief, Southern argues that the Appendix B minimum bill filing was in fact its first choice, and that we should therefore assess the merits of FERC's decision to reject it. In this regard, Southern argues that there is no magic in the word "alternative," and that this court should, as did FERC, address its claims on the merits.
 
 
 29
 We disagree. On its face, Southern's filing plainly presents the Appendix B minimum bill tariffs as a second choice alternative to the Appendix A tariffs. Southern's "Statement of Nature, Reasons and Basis for Change in Tariff" (Statement), for example, first describes the Appendix A tariff sheets, and only then proceeds to a discussion of the Appendix B sheets:
 
 
 30
 As an alternate to the proposed rate changes in the Appendix A tariff sheets, Southern is proposing lower jurisdictional rates in the alternate tariff sheets in Appendix B based upon the concurrent operation of an annual commodity bill....
 
 
 31
 The balance of the Statement, containing sections entitled "Reasons for the Change" and "Basis for the Change," does not even mention the minimum bill but rather concentrates entirely on the need for a general rate increase and the appropriateness of the MFV structure for Southern's system. Southern clearly submitted this Statement as a justification not for the minimum bill, but for the rate increase set forth in Appendix A.
 
 
 32
 Nor are we persuaded by the argument in Southern's supplemental brief that, by stating in its transmittal letter that the alternate Appendix B tariff sheets "are proposed to be effective on May 1, 1986 in lieu of the Appendix A tariff sheets," it plainly indicated that Appendix B was actually its first choice. Southern leaves out of the quoted sentence the opening phrase--"If accepted by the Commission,...." Read as a whole, the sentence says nothing more than that, if FERC chooses the Appendix B tariff sheets rather than the Appendix A sheets, Southern wishes to put the Appendix B rates into effect on the same date it was proposing to implement the Appendix A sheets if they were accepted.
 
 
 33
 The next paragraph of Southern's letter further undercuts its present claim. There the letter refers to FERC's rejection of Southern's earlier filing of a short-form minimum bill proposal on the ground that the filing constituted a "major rate increase," which, under FERC regulations, necessitates a long-form filing. See Southern Natural Gas Co., 32 FERC p 61,447 (1985), aff'd, 813 F.2d 1111 (11th Cir.1987). At the time Southern submitted the presently disputed filing, its petition for review of FERC's order rejecting its short-form minimum bill filing was pending before the Eleventh Circuit. Southern had two options: it could file, as its new first choice, (1) an MFV proposal without a minimum bill; or (2) a minimum bill proposal meeting the long-form requirement for a major rate increase. Southern chose the first option, stating in its filing letter, as noted above, "Southern has filed the Appendix B revised tariff sheets with a minimum commodity bill as an alternative in order to allow the Appendix A rate change to be effective without prejudice to Southern's position in [the Eleventh Circuit proceeding]."
 
 
 34
 As we read the quoted passage, Southern wanted to have the Appendix A tariffs go into effect, as they did, but to reserve its right, in the event the Eleventh Circuit reversed FERC's determination that the earlier filing constituted a major rate increase, to place the short-form filing into effect instead of the Appendix A tariffs. As Southern structured its filing, therefore, the Appendix B tariff sheets were in reality its third choice, to be implemented only in the event that (1) Southern lost before the Eleventh Circuit; and (2) FERC rejected the Appendix A sheets. Whatever its strategic reasons for so structuring its present filing, it cannot not now escape the necessary implications of that structure.
 
 
 35
 Southern claims in its supplemental brief that lost sales are costing it money under the Appendix A tariff structure, and that, had FERC instead accepted Appendix B, this would not have occurred. We must take Southern's filing as it was made, however. Circumstances change, so that the first one now may later be last; but having received from FERC what it presented as its first choice, the Appendix A tariff, Southern is not "aggrieved," in any sense contemplated by NGA Sec. 19(b), by FERC's rejection of its second choice. We therefore decline Southern's invitation to review FERC's discussion of the merits of the Appendix B tariff and dismiss its petition for review in this regard.
 
 III. THE ALAGASCO TRANSPORTATION TARIFF
 
 36
 Southern next challenges FERC's rejection of its transportation tariff for Alagasco. FERC defends this aspect of its decision on the merits, but also raises a jurisdictional argument, to which we turn first.
 
 
 37
 In Decision I, FERC rejected the Alagasco tariff, apparently on the ground that Southern did not have a Sec. 7 certificate for the service. We say "apparently" because this reason for the rejection appeared only in an ordering paragraph at the end of the decision; nowhere in the "Discussion" portion of the decision did FERC advert to the lack of a certificate or even mention Alagasco specifically. In the "Discussion" section, on the other hand, FERC did make the following observation:
 
 
 38
 Southern has proposed to develop a seasonally differentiated transportation rate by simply backing out the purchased gas cost component of its proposed seasonally differentiated sales rate. Southern has not shown that this rate is cost based as required by the Commission's regulations.
 
 
 39
 This criticism refers to Southern's generally applicable method of computing transportation rates; thus, it would apply to each of the eighteen customers, including Alagasco, with respect to which Southern submitted tariffs. FERC unconditionally accepted for filing the tariffs for the other seventeen customers, however, in the ordering paragraphs of its decision.
 
 
 40
 Southern petitioned for rehearing with respect to FERC's rejection of the Alagasco tariff solely and straightforwardly on the ground that it had in fact obtained the requisite Sec. 7 certificate for that service. Southern's petition nowhere took issue with FERC's observation that the method used in calculating the proposed transportation rates did not comply with FERC regulations. In Decision II, FERC acknowledged its error with respect to the certificate requirement, but clung to its result on the basis of its critique of Southern's transportation rates in the "Discussion" section of Decision I. FERC characterized its decision there to reject the Alagasco rate as having rested on both grounds, although it had there accepted seventeen of the eighteen rates subject to the same objection.
 
 
 41
 Against this background, we think that Southern's challenge to FERC's cost rationale is properly before us. Section 19(b) of the NGA requires a person aggrieved by a FERC order to petition the Commission for rehearing before petitioning the Court of Appeals for review. 15 U.S.C. Sec. 717r(b). In order to put teeth into that requirement, it also provides that "[n]o objection to the order of the Commission shall be considered by the court unless such objection shall have been urged before the Commission in the application for rehearing unless there is reasonable ground for failure to do so." Id.
 
 
 42
 Southern's failure before the agency to object to the claimed cost rationale for FERC's decision raises two questions going to this court's jurisdiction. First, was there "reasonable ground" for Southern's failure to raise the objection in its petition for rehearing of Decision I? Second, did FERC's treatment of the Alagasco tariff in Decision II make the order denying rehearing an "order" apart from the order in Decision I, such that Alagasco should have filed a further petition for rehearing before seeking judicial review? See Tennessee Gas Pipeline Co. v. FERC, 871 F.2d 1099, 1109-10 (D.C.Cir.1989).
 
 
 43
 As to the first question, we disagree with FERC's argument that Decision I put Southern on notice of its cost rationale for rejecting the Alagasco tariff so that Southern should have raised an "objection" to that rationale in its petition for rehearing. Given that the sole reference to Alagasco in Decision I was that in which FERC rejected the tariff for want of a Sec. 7 certificate, and given that its earlier mention of the cost basis for Southern's transportation rates in general neither specifically referred to Alagasco nor caused FERC to reject the other tariffs equally liable to that objection, Southern had "reasonable ground" to believe that FERC's rejection of the Alagasco rate rested solely upon its erroneous want-of-certificate ground, and thus to limit its objection accordingly.
 
 
 44
 As to the second question, counsel for FERC suggested at oral argument that, even if FERC did not properly set forth the cost rationale for its rejection of the Alagasco tariff until Decision II, the consequence is only that Southern, before seeking judicial review, should have filed with the agency a further petition for rehearing, this time with respect to Decision II, objecting to the new rationale.
 
 
 45
 This court has previously held that an order denying rehearing does not necessarily constitute a new "order" as to which a new petition for rehearing is required. Public Service Commission v. FPC, 543 F.2d 757, 775 n. 116 (D.C.Cir.1974). As the Court of Appeals for the First Circuit has observed, "[t]o interpret the statute otherwise would be to permit an endless cycle of applications for rehearing and denials." Boston Gas Co. v. FERC, 575 F.2d 975, 978 (1st Cir.1978). On the other hand, an order on rehearing that modifies the result reached in the original order may be significant enough to trigger a new rehearing requirement. Tennessee Gas, 871 F.2d at 1109-10.
 
 
 46
 The only "order" at issue with respect to Alagasco was FERC's rejection, in the ordering paragraphs at the end of Decision I, of the Alagasco tariff. As we noted in Tennessee Gas, "[i]t is of course a fine point to determine whether a subsequent modification amounts to a new order [as to which a new petition for rehearing is required] or is merely a technical change in an existing order." Id. at 1110. Regardless of where that line may be drawn with respect to a modification in the result reached in the original order, when FERC makes no change in the result, but merely supplies a new improved rationale upon realizing that its first one won't wash, it does not thereby transform its order denying rehearing into a new "order" requiring a new petition for rehearing before a party may obtain judicial review. Otherwise, we would "permit an endless cycle of applications for rehearing and denials," limited only by FERC's ability to think up new rationales--which, since none of them would be put to a test in court, would not be much of a limitation. Congress could not have intended that the agency have such complete control over access to judicial review by a party aggrieved.
 
 
 47
 Turning to the merits, the circumstances that lead us to reject FERC's jurisdictional argument also raise serious questions as to the rationality of its decision with respect to the Alagasco tariff. FERC does not defend its initial rationale for rejecting that tariff; it is common ground that Southern has obtained the requisite certificate for its transportation arrangement with Alagasco. Rather, as in Decision II, FERC relies solely on its statement, in Decision I, to the effect that Southern's transportation rates were not cost-based. The difficulty with this rationale, as noted above, is that it appears to apply to each of the eighteen transportation tariffs submitted by Southern. At no point has FERC explained, however, why it rejected the Alagasco tariff but accepted the seventeen others, a result that is, on its face, arbitrary. Accordingly, we grant Southern's petition for review as it pertains to the Alagasco tariff, vacate the relevant portions of Decisions I and II, and remand the matter for FERC to proceed anew.
 
 IV. THE BLOCK RATES
 
 48
 In Decision I, FERC gave two reasons for rejecting Southern's proposal for an incentive rate for purchases over a specified percentage of a customer's contract demand: (1) that the structure constituted a "new service" requiring a Sec. 7 certificate; and (2) that the rates established thereunder might violate Sec. 4. In Decision II, FERC added that Southern "has not met its prima facie burden of showing that its rates are just and reasonable" because it failed to show that the disparity between its proposed Block I and Block II rates corresponded to a difference in its "cost of providing service for each block."
 
 
 49
 Southern claims that the last-mentioned rationale is unsupported by the evidence. Specifically, it points to data that it submitted along with its filing showing that it derived the proposed rate structure as a whole, taking into consideration the operation of both the Block I and the Block II rates, from its jurisdictional costs.
 
 
 50
 Procedurally, this objection stands in the same posture as Southern's objection to FERC's cost rationale for rejecting the Alagasco transportation tariff: it challenges a rationale that the agency advanced for the first time in the course of denying rehearing. Because we have already held that Southern was not obliged to file a further petition for rehearing in order to challenge such an afterthought, this objection is properly before the court.
 
 
 51
 On the merits, however, Southern's argument misses the point. FERC objected to the proposed Block II rate not because the rate structure as a whole was insufficiently justified by Southern's fixed costs, but rather because the differential between the Block I and Block II rates was not cost-justified. In other words, Southern failed to show that the cost of providing service above the contract demand levels that would trigger the Block II rate was lower than its cost with respect to the Block I rate. Southern does not challenge FERC's authority to require such cost justification. It denies that it "failed to adequately show that its proposed block rate is cost based," but the record explanation to which it refers shows that the Block II rates were set without regard to a difference in the costs of providing the services:
 
 
 52
 Block I rates were designed to recover all of the fixed and variable costs assigned to the commodity component. Rates for the Block II incentive sales are based on 50% of the Block I rates for the corresponding season.
 
 
 53
 Inasmuch as FERC's cost-based reason for rejecting the Block II rates is both properly before us and adequate to support its decision, we need not address its other reasons for reaching the same result.
 
 V. CONCLUSION
 
 54
 Because Southern was not aggrieved in any cognizable way by FERC's rejection of its Appendix B tariffs, we dismiss its petition for review in that respect. We deny the petition on the merits insofar as it challenges FERC's decision with respect to the proposed block rate structure. Finally, because FERC did not adequately explain its decision to reject the Alagasco tariff, we grant Southern's petition as it pertains to that tariff, vacate FERC's decision to reject the tariff, and remand the matter to FERC for further proceedings.
 
 
 55
 We cannot bid good riddance to this case, though, without remarking on the sloppiness with which it has been handled by both parties. The careless way in which FERC cobbled together its opinions is apparent from our discussion; if the agency had put more forethought into its first decision, it would not have had to rely so much upon afterthoughts in its second effort. As for Southern, although one of its arguments hits a rather easy mark, its treatment of the minimum bill issue is either careless or disingenuous; either way, it has not given this court an intelligible account of itself.
 
 
 56
 Judgment accordingly.