904 F.2d 1456
 COLORADO INTERSTATE GAS COMPANY, Petitioner,
v.
FEDERAL ENERGY REGULATORY COMMISSION, Respondent,
The Gates Rubber Company; Questar Pipeline Company; K N
Energy, Inc.; City of Colorado Springs; Natural
Gas Pipeline Company of America, Intervenors.
 No. 88-1932.
 United States Court of Appeals,
Tenth Circuit.
 May 31, 1990.
 
 William W. Brackett (Rebecca N. Noecker, Vice President and Asst. Gen. Counsel, Colorado Interstate Gas Co., Colorado Springs, Colo.; Daniel F. Collins, Sr. Vice President, Donald C. Shepler, Gen. Atty., and Kathrine L. Henry, Sr. Atty., Colorado Interstate Gas Co., Washington, D.C., with him on the briefs), Washington, D.C., for petitioner.
 Robert H. Solomon, Atty. (Catherine C. Cook, Gen. Counsel, and Jerome M. Feit, Sol., with him on the briefs), Federal Energy Regulatory Com'n, Washington, D.C., for respondent.
 Paul Korman (Paul W. Mallory, Paul E. Goldstein, and Joseph M. Wells, Lombard, Ill.; and J. Curtis Moffatt of Gardner, Carton & Douglas, Washington, D.C., with him on the briefs) Washington, D.C., for intervenor.
 Before LOGAN and BRORBY, Circuit Judges, and BRATTON,* District Judge.
 BRORBY, Circuit Judge.
 
 
 1
 Petitioner Colorado Interstate Gas Co. (CIG) appeals two final administrative orders of the Federal Energy Regulatory Commission (FERC, or Commission) relating to the rates CIG may charge for the sale and transportation of natural gas. Specifically, CIG asserts FERC erred in ordering the elimination of the fixed-cost minimum commodity bill provision in CIG's service agreement with Natural Gas Pipeline Co. of America (NGPL) and in rejecting CIG's proposed transportation rate for "on-system" service.[1] We affirm the challenged portions of the FERC orders.
 
 
 2
 This proceeding originated when CIG, an interstate natural gas pipeline company subject to the Natural Gas Act, 15 U.S.C. Secs. 717-717w, filed with FERC a rate increase request under section 4 of the Act, 15 U.S.C. Sec. 717c. FERC ordered a hearing on the lawfulness of the proposed rates, which was conducted by a FERC administrative law judge (ALJ). The Commission subsequently affirmed in substantial part the ALJ's initial decision in Opinion No. 290, Colorado Interstate Gas Co., 41 FERC p 61,179 (1987), and then denied rehearing in Opinion No. 290-A, Colorado Interstate Gas Co., 43 FERC p 61,089 (1988). At issue in this appeal are FERC's holdings that the fixed-cost minimum commodity bill in CIG's service agreement with NGPL was anticompetitive and must be eliminated and that CIG's proposed on-system transportation rate is unjust and unreasonable.[2]
 
 
 3
 Under CIG's contract with NGPL, NGPL is entitled to buy a specified quantity of natural gas (currently 47 billion cubic feet (Bcf) per year) from CIG, and CIG must stand ready to deliver that quantity. The first issue in dispute is the contract's minimum bill provision, which requires NGPL to pay the commodity costs associated with ninety percent of its annual entitlement, even if it takes delivery of no gas from CIG.[3] CIG recovers from NGPL approximately $15 million annually in production and gathering costs via the minimum bill and $9 million annually collected through a demand charge. FERC ruled that the minimum bill is anticompetitive, and thus unjust and unreasonable, and ordered that it be eliminated. This would limit to the demand charge alone CIG's guaranteed recovery from NGPL of fixed costs incurred on NGPL's behalf. FERC also ruled that CIG failed to bear its burden of proving the justness and reasonableness of its proposed rate increase for on-system transportation. The agency accordingly rejected CIG's request and ordered refunds for the period the proposed rate had been in effect.
 
 
 4
 We review these decisions pursuant to 15 U.S.C. Sec. 717r. The factual findings of FERC, if supported by substantial evidence, are conclusive. Section 717r(b); Colorado Interstate Gas Co. v. FERC, 791 F.2d 803, 807 (10th Cir.1986), cert. denied, 479 U.S. 1043, 107 S.Ct. 907, 93 L.Ed.2d 857 (1987) (CIG I ). Moreover, under the Administrative Procedure Act, a court can set aside an agency action only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. Sec. 706(2)(A); cf. In re Permian Basin Area Rate Cases, 390 U.S. 747, 790, 88 S.Ct. 1344, 1372, 20 L.Ed.2d 312 (1968) (FERC's orders "may not be overturned if they produce 'no arbitrary result' "). The "substantial evidence" test has been equated with the "arbitrary and capricious" standard of review. East Tenn. Natural Gas Co. v. FERC, 863 F.2d 932, 937 (D.C.Cir.1988) (East Tennessee ) (quoting Maryland People's Counsel v. FERC, 761 F.2d 768, 774 (D.C.Cir.1985)).
 
 
 5
 The burden of proving that a rate change is "just and reasonable," 15 U.S.C. Secs. 717c-717d, is on the party proposing the change. CIG I, 791 F.2d at 806; East Tennessee, 863 F.2d at 937. When FERC initiates review of an existing rate structure, it bears the burden of proving that the existing rates are unjust and unreasonable and that those it orders in replacement are just and reasonable. 15 U.S.C. Sec. 717d(a); East Tennessee, 863 F.2d at 937. Once it makes these prima facie showings, the burden shifts to the opposing party to rebut them. E.g., Transwestern Pipeline Co. v. FERC, 820 F.2d 733, 746 (5th Cir.1987), cert. denied 484 U.S. 1005, 108 S.Ct. 696, 98 L.Ed.2d 648 (1988).
 
 
 6
 We find it unnecessary to detail much of the background of this case--the purposes of the Natural Gas Act, the procedural history of this action, and the nature and workings of CIG's rate structure and the elements thereof--as these exercises have been performed adequately by this court or others on various occasions. See, e.g., CIG I, 791 F.2d at 805 (describing the early procedural history of this case and CIG's minimum bill provision); Associated Gas Distributors v. FERC, 824 F.2d 981, 995-96 (D.C.Cir.1987), cert. denied 485 U.S. 1006, 108 S.Ct. 1468, 99 L.Ed.2d 698 (1988) (describing purposes of the Act and the evolving regulatory climate); Wisconsin Gas Co. v. FERC, 770 F.2d 1144, 1149-53 (D.C.Cir.1985), cert. denied, 476 U.S. 1114, 106 S.Ct. 1968, 90 L.Ed.2d 653 (1986) (discussing the operation of minimum bills generally, how FERC policy with respect to minimum bills has evolved in response to changes in the gas industry, and FERC's statutory authority); Mississippi River Transmission Corp. v. FERC, 759 F.2d 945, 947-50 (D.C.1985) (discussing minimum bills). Thus we proceed with our discussion of the issues.
 
 I. The Minimum Bill
 
 7
 CIG claims that minimum bills are just and reasonable generally and in this case specifically. It argues that its minimum bill does not have anticompetitive effects and is necessary to prevent NGPL from shifting its cost responsibility to CIG or to CIG's other customers. Finally, CIG claims that, even if the minimum bill is anticompetitive, it meets each of the three tests for retaining a minimum bill established in In re Atlantic Seaboard Corp., 38 FPC 91 (1967), aff'd, Atlantic Seaboard Corp. v. Federal Power Comm'n, 404 F.2d 1268 (D.C.Cir.1968).[4]
 
 
 8
 CIG made preliminary arguments concerning the minimum bill that will not be discussed in detail here as we find them without merit. Briefly, CIG claims that minimum bills have been found just and reasonable in other proceedings and that CIG's own minimum bill was upheld as reasonable in a prior action. Colorado Interstate Gas. Co., 27 FERC p 61,315 (1984), aff'd, 791 F.2d 803 (10th Cir.1986), cert. denied, 479 U.S. 1043, 107 S.Ct. 907, 93 L.Ed.2d 857 (1987) (CIG I ). Thus, it argues, the Commission's action here is inconsistent with FERC precedents.
 
 
 9
 We are persuaded, however, by FERC's counterarguments. It makes clear that the action challenged here accords with FERC's "increasingly less tolerant" treatment of minimum bills in recent years. This attitude, largely a result of changes in the gas industry, is reflected in FERC Opinion No. 380 (which eliminated variable-costs minimum bills) and subsequent rulemaking decisions. See Texas Eastern Transmission Corp. v. FERC, 893 F.2d 767 (5th Cir.1990) (citing cases finding minimum bills unjust and unreasonable). Neither Opinion No. 380 nor the Commission's ruling in the prior CIG rate case is inconsistent with FERC's ruling in the instant action. FERC expressly reserved judgment in Opinion No. 380 on the question of fixed-cost minimum bills. In CIG I the agency expressed concern about allowing CIG full recovery of its fixed costs; it directed its staff to "consider the proper level of fixed cost recovery" in the next CIG rate case. The "next" case is this case, and FERC's decision here that the proper level of recovery of fixed costs is no recovery (i.e., no minimum bill) thus accords with its earlier rulings.
 
 
 10
 Moreover, slavish adherence to precedent by an administrative agency would prohibit innovation and adjustment to changing conditions. Obviously, when Congress establishes a regulatory commission the expectation is for the agency to adapt to changing circumstances. This, simply, is what FERC has done here.
 
 
 11
 Having disposed of CIG's preliminary arguments, we proceed to its two principal assertions: that its minimum bill is not anticompetitive and that, even if it is, it satisfies the traditional criteria for retaining a minimum bill.
 
 
 12
 FERC acknowledges that it and NGPL carried the initial burden of proof with respect to the minimum bill because CIG had proposed no change in this feature of its rate structure. Although FERC's discussion of its reasons for finding the minimum bill anticompetitive was rather meager, the agency was entitled to rely on the presumption of anticompetitiveness established in Transcontinental Gas Pipe Line Corp., 40 FERC p 61,188, at 61,589-90 (1987) (Opinion No. 260-A). An agency may rely on its general policy as established in an earlier proceeding for the required prima facie showing. See Kansas Gas & Elec. Co. v. FERC, 758 F.2d 713, 719-20 (D.C.Cir.1985) (upholding FERC's order barring the application of a particular rate provision, based on FERC's previously formed conclusion that the provision tends to be unjust and unreasonable, unless the pipeline makes specific showings).[5]
 
 
 13
 In Transcontinental Gas Pipe Line Corp., FERC decided that "a traditional fixed cost minimum bill usually restrains competition and is presumptively unjust and unreasonable." 40 FERC p 61,188, at 61,590 (1987) (Opinion No. 260-A). Accordingly, FERC established the "policy that in the future a pipeline must carry the burden of producing evidence to justify retention of its fixed cost minimum bill." Id. at 61,590. In its brief in this case, FERC also recites the proceedings and cases that have upheld the conclusion that full-cost minimum commodity bills are anticompetitive, asserting there is "no reason to assume that the ... conclusion[s] would have been any different" in those cases had the issue been fixed cost minimum bills instead."[6]
 
 
 14
 In the proceeding below, at least ostensibly, FERC relied not so much on the established presumption as on arguments made by NGPL. NGPL claimed that the minimum bill was anticompetitive because "alternate supply sources must be priced lower than CIG's commodity rate by at least the amount of the minimum commodity bill before the two purchases are equally attractive to [NGPL]." Opinion No. 290, at 61,465 (quoting Exhibit 140 at 10-11). FERC found this "sound theory." Id. The agency also considered it significant that CIG admitted it was in a "gas over supply situation." Id. FERC held these circumstances sufficient to demonstrate the minimum bill's anticompetitiveness and to shift the burden to CIG. Opinion No. 290, at 61,465 (citing Transwestern Pipeline Co., 36 FERC p 61,175, at 61,589 (1987)).[7] We agree.
 
 
 15
 CIG's first principal line of argument offered in rebuttal is that minimum bills are just and reasonable generally and in this case specifically. CIG states that, while it remains obligated to stand ready to supply NGPL's full contract entitlement, NGPL has been buying little or no gas from CIG.[8] CIG argues that NGPL's minimum bill does not have anticompetitive effects, pointing to the fact that NGPL has purchased gas from other pipeline companies, at prices higher than the CIG contract price, instead of taking gas under its contract with CIG. CIG concludes this evidence refutes any assertion that NGPL was "forced to forego cheaper gas supplies in order to buy CIG's gas."
 
 
 16
 CIG further alleges the minimum bill is necessary to prevent NGPL from shifting NGPL's cost responsibility to CIG or to CIG's other customers.[9] CIG asserts NGPL should not be allowed to avoid paying the fixed costs incurred by CIG as a result of fulfilling its contract obligation to NGPL. This is especially true, CIG claims, because NGPL did not take full advantage of an opportunity in 1984 to reduce its entitlement volume (i.e., renominate) to a level more closely approximating its projected purchases from CIG.
 
 
 17
 FERC calls "unsubstantiated" the claim that NGPL has been purchasing increasing amounts of gas from other suppliers at higher prices. However, a witness for NGPL testified on cross-examination that during the period May 1985 to September or October 1985 NGPL had purchased 200-250 Bcf of gas at prices exceeding the CIG contract price. This volume was 2.5-3 times NGPL's entitlement from CIG at the time. FERC counters:
 
 
 18
 Even if [CIG's] unsubstantiated claim as to [NGPL's] purchasing practices is accurate, it does nothing to answer the obvious fact that absent the minimum bill, [NGPL] might have purchased additional gas supplies from suppliers other than CIG or that it might have sought a different mix of services from its pipeline suppliers.
 
 
 19
 Pressing this argument, FERC claimed that the price actually paid by NGPL "is not, of course, dispositive of this question," citing for support Wisconsin Gas Co. v. FERC, 770 F.2d 1144 (D.C.Cir.1985), cert. denied, 476 U.S. 1114, 106 S.Ct. 1968, 90 L.Ed.2d 653 (1986). Wisconsin Gas held that the appropriate inquiry in assessing a minimum bill's effect on competition is "not whether a particular pipeline will pursue a least-cost purchasing strategy, but is instead whether the customer will have the ability to do so." 770 F.2d at 1159. The Wisconsin Gas court noted that, even if some gas customers did not pursue a least-cost strategy, FERC's evidence showed that many would; hence, "elimination of minimum bills can reasonably be expected to lower gas costs and spur competition among pipelines." Id.[10]
 
 
 20
 FERC also finds two flaws in CIG's renomination argument. First, it faults CIG for presuming NGPL was able to predict accurately its future gas purchases from CIG. Second, it asserts that renominating a zero or near-zero entitlement (as CIG suggests NGPL should have done) would have foreclosed NGPL from purchasing gas from CIG, one of its largest historical suppliers. FERC concludes the opportunity to renominate did not "negate the obvious anticompetitive effect" of the minimum bill.
 
 
 21
 We admit to being somewhat puzzled by NGPL's purchasing practices and sympathetic to the argument that the minimum bill is not discouraging NGPL from purchasing gas from suppliers other than CIG. But testimony by NGPL suggests other factors besides price motivate a gas company's choice of supplier.[11] We will not speculate as to the motives behind NGPL's purchasing decisions. Considering all of CIG's arguments, we do not find substantial evidence to rebut FERC's reasonable showing of the anticompetitiveness of minimum bills, including CIG's.
 
 
 22
 CIG's second principal line of argument is that, even if its minimum bill provision is anticompetitive, it nevertheless merits retention because it meets all of the so-called Seaboard factors, the satisfaction of only one of which is sufficient to justify retaining a minimum bill.[12] Panhandle Eastern Pipeline Co. v. FERC, 881 F.2d 1101, 1113 (D.C.Cir.1989). FERC rejected CIG's arguments, however, finding the minimum bill satisfied none of the Seaboard criteria.
 
 
 23
 A. Protecting the pipeline against the risk of nonrecovery of fixed costs.
 
 
 24
 With respect to the first Seaboard factor, CIG argues that the "minimum bill is necessary to assure that parties [i.e., NGPL] who caused CIG to incur fixed costs bear the costs which they have caused." The minimum bill is needed because NGPL is no longer buying gas from CIG; thus, it is no longer paying those fixed charges included in the sales commodity rate. CIG's brief is somewhat ambiguous on this point, but it appears the costs that CIG claims would be unrecoverable from NGPL without a minimum bill are fixed production and gathering costs, the return on equity and associated income taxes, and carrying charges associated with take-or-pay expenditures allocated to NGPL.
 
 
 25
 FERC's simple answer to this argument is that the recovery of these costs should not be guaranteed.[13] FERC agrees that the above costs itemized by CIG are not included in the demand charge, but in the commodity charge; accordingly NGPL pays them only when it buys gas. But FERC has decided that these costs should be at risk. Transcontinental Gas, 40 FERC p 61,188, at 61,590. This is "sound Commission policy" because it serves as "an incentive to the pipeline to minimize these costs and to make prudent expenditures," and because CIG "should not be guaranteed a profit."
 
 
 26
 We find the D.C. Circuit's reasoning in East Tennessee helpful in disposing of this issue. In a similar fact situation the D.C. Circuit held that FERC's policy judgment--that placing at risk certain production costs (such as return on equity) would encourage the pipeline company to increase its competitiveness--was a judgment "well within [FERC's] discretion in deciding what is a just and reasonable rate." 863 F.2d at 939. The court further concluded that this policy judgment constituted substantial evidence for rejecting the first Seaboard justification for retaining the minimum bill.[14]
 
 
 27
 In assessing the reasonableness of FERC's judgment that certain costs should be at risk, the East Tennessee court noted the pipeline company presented no testimony that it would "not be able to compete for sales effectively" absent a minimum bill. 863 F.2d at 940. It is not clear from the opinion, however, what weight the court would have accorded such evidence had it been offered. Here, CIG makes such an argument in its reply brief. According to CIG, FERC's suggestion that NGPL's minimum bill volume "can readily be 'made up' " by selling gas to other customers is "wholly unrealistic" and "ignores stark market reality." CIG does not cite to evidence in the record that would support this contention, however, and we have found none.[15] CIG also has stated that "its ability to recapture the lost [NGPL] sales is not supported by the record." Opinion No. 290-A, at 61,278. FERC stated in Opinion No. 290-A that it "did not rely on this rationale but merely observed that CIG might be able to compete for more business." Opinion No. 290-A, at 61,278 (emphasis added).
 
 
 28
 We do not find CIG's argument on this point persuasive, nor will we set aside FERC's judgment on the basis of factual arguments apparently raised for the first time in this appeal. We find no basis on which to disagree with FERC's balancing of the relevant interests and its ultimate conclusion that certain fixed costs should not be recovered, through a minimum bill or otherwise. It is apparent that FERC is spurring CIG to become more competitive in its marketing of natural gas rather than sit back, do nothing and still be assured of recovering costs and achieving profits. Thus, we hold the Commission's rejection of the first Seaboard factor was neither arbitrary nor capricious.
 
 
 29
 B. Protecting full requirements customers.
 
 
 30
 Similarly, we find reasonable FERC's arguments for rejecting the second Seaboard justification--that the minimum bill is necessary to protect CIG's full-requirements customers from bearing a disproportionate share of fixed costs.[16] FERC did not deny that CIG itself or some of its other customers might bear the burden of paying fixed costs not paid by NGPL. It concluded, however, that "the benefits to ratepayers of placing [CIG] at risk for [certain] costs here involved outweigh the potential detriment of shifting those costs to full requirements customers." 41 FERC at 61,466 (citing Transcontinental Gas, 40 FERC p 61,188, at 61,590.) CIG claims FERC's reasoning "completely dismisses this second criterion."
 
 
 31
 In its brief FERC offers the following explanation for its conclusion regarding Seaboard factor 2. The "benefits to ratepayers" to which its opinion refers, FERC asserts, "are well known to CIG and other members of the natural gas community that participated in the Commission's Order No. 380 rulemaking proceeding [eliminating recovery of variable costs from minimum bills]." FERC cites, without listing, "several benefits" identified by the D.C. Circuit in reviewing that order (citing Wisconsin Gas, 770 F.2d at 1161). The "most significant" of these benefits is "lower prices for all customers resulting from the increased incentive to compete vigorously in an environment where minimum bills do not maintain gas prices at artificially high levels."[17] As for the "costs" of eliminating the minimum bill, FERC also adopted the Wisconsin Gas court's finding that the harm, if any, to full requirements customers "would be isolated, of short duration, and outweighed by the overall long-term benefits to these customers."
 
 
 32
 FERC's brief makes clear what its challenged orders do not--that FERC views the costs and benefits of eliminating the minimum bill "from a 'national perspective' " (quoting 770 F.2d at 1161). This was also the view FERC adopted in its rulemaking eliminating recovery of variable costs in all minimum bills, an approach affirmed by the D.C. Circuit in Wisconsin Gas. Since then the D.C. Circuit has affirmed FERC's reliance on this balancing test in eliminating a company's minimum bill altogether. East Tennessee, 863 F.2d at 940. See In re Atlantic Seaboard Corp., 404 F.2d at 1274 ("task of determining what interests should be protected, and to what extent, is a policy matter for the agency"). We also find it a reasonable approach.
 
 
 33
 In order to overcome the foregoing considerations, FERC requires a pipeline to "produce evidence to show that excessive cost-shifting would occur on its system in the absence of a minimum bill." Tennessee Gas, 871 F.2d at 1105. FERC and the D.C. Circuit interpret this requirement to mean "concrete evidence" not simply speculation. Id. Here FERC stated CIG "must offer more than broad generalities and vague possibilities of economic calamities" that might result in the absence of a minimum bill, and that "CIG must specifically demonstrate that particular full requirements customers are likely to bear higher overall rates as a result of the minimum bill's elimination" (citing Mississippi River Transmission Corp. v. FERC, 759 F.2d 945, 955 (D.C.Cir.1985)).
 
 
 34
 This approach to the second Seaboard justification, approved by the D.C. Circuit, has been described in more detail by FERC in at least two prior cases. In Tennessee Gas Pipeline Co. and Transwestern Pipeline Co., FERC made clear it will not
 
 
 35
 approve a minimum bill simply because there exists the slightest possibility that some costs will be shifted to full requirements customers.... To balance these conflicting interests the initial questions that must be answered are: Will the full requirements customers be affected ...? If so, by how much? These questions are intensely factual. They turn on the resolution of such subsidiary questions as: Will the partial requirements customer in fact reduce its purchases? If so, by how much? Will the reduction be short-term or long-term? Will the pipeline reduce its costs to compete for the partial requirements customer? And, will the pipeline increase sales to other customers be they existing or new?
 
 
 36
 Tennessee Gas, 871 F.2d at 1105 (quoting 40 FERC p 61,140, at 61,437), and (36 FERC p 61,175, at 61,145).
 
 
 37
 FERC concluded here and we agree that "CIG simply has not demonstrated any shifting of costs with sufficient specificity to warrant the retention of its minimum bill." Thus, FERC reasonably rejected the second Seaboard justification.[18]
 
 
 38
 C. Protecting customers from take-or-pay liabilities.
 
 
 39
 Finally, FERC concluded the minimum bill does not serve as a means of minimizing take-or-pay costs--the third Seaboard justification.[19] Here, too, FERC held CIG's evidence insufficient to make the required showing. It found that "CIG ... has shown no specific connection between its minimum bill and its take-or-pay obligations." Opinion No. 290, 41 FERC at 61,466. Specifically, FERC noted that "CIG has not referred to any record evidence that [NGPL's] cutbacks caused or will cause particular minimum bill or take-or-pay obligations to be incurred [by CIG]." Opinion No. 290-A, 43 FERC at 61,278.[20]
 
 
 40
 Requiring a specific connection is consistent with FERC's approach affirmed in other cases. For example, Tennessee Gas held that a minimum bill can be justified under this factor "if it links cost-incurrence with cost-causation, i.e., if it assists in collecting take-or-pay costs from those customers that have caused the costs by reducing their purchases." 871 F.2d at
 
 
 41
 1105.[21] While CIG alleged such a connection, it offered no evidence in support thereof. Indeed, it may have been unable to make such a demonstration, given that CIG's sales to customers other than NGPL apparently also had declined in recent years.
 
 
 42
 CIG calls FERC's assertions on this issue "cavalier" and "disingenuous in light of the facts." Yet the "facts" relied on by CIG are remarkably skimpy. For example, CIG claims it purchases gas under firm take-or-pay contracts in order to meet NGPL's demand. But CIG's only citation to the record in support of this claim is incomplete and misleading. Testimony immediately following the statement to which CIG refers states that CIG does not necessarily incur take-or-pay liability "to the extent it is unable to sell gas to [NGPL]." And CIG cites no facts to bolster its argument that the CIG minimum bill, "[b]y providing an economic incentive to NGPL to buy from CIG, ... allows [CIG] to avoid take-or-pay deficiencies." (Emphasis in original). Indeed, CIG disregards the glaring inconsistency between this allegation and its repeated emphasis on NGPL's failure to buy CIG's gas in favor of more costly supplies.
 
 
 43
 The Commission also points out that CIG has not quantified any take-or-pay costs it has incurred allegedly because of NGPL's failure to buy gas. FERC further argues that elimination of a minimum bill "does not invariably lead to increased pipeline take-or-pay costs," noting that CIG's minimum bill contains a crediting provision like the one in Wisconsin Gas, which allowed penalty payments to be credited to subsequent gas purchases. See 770 F.2d at 1160. CIG has responded to neither of these arguments.
 
 
 44
 Accordingly, the Commission determined and we agree that CIG has not adequately demonstrated its minimum bill was necessary to enable CIG to collect its take-or-pay costs. Allegations and arguments claiming necessity to protect customers from take-or-pay liabilities are not sufficient. Having failed to satisfy any of the three Seaboard justifications for retaining a minimum bill, FERC properly concluded the bill was unjust and unreasonable and should be eliminated.
 
 II. Transportation Rates
 
 45
 The second issue on appeal is FERC's rejection of CIG's requested transportation rate change. CIG proposed to increase its on-system ("EUS-1"), or sales displacement, rate from 36cents to approximately 60.95cents per million cubic feet (Mcf). It also proposed an off-system ("EUS-2") rate of 30.63cents per Mcf. CIG argues FERC erred in rejecting its proposal and in establishing the same rate for on- and off-system transportation,[22] but that even if FERC's rate design is upheld, it should not be applied to certain certificated transactions.
 
 
 46
 CIG argues the increased on-system rate is needed to pay the costs it fails to recover when it merely transports gas to its on-system market, versus when it makes a gas sale. Transporting gas on-system displaces its own sales, CIG asserts; thus the pipeline suffers an "economic penalty" if the transportation rate does not recover the same costs that a sale would recover. CIG's proposed on-system rate was designed to "recover [CIG's] fully allocated sales commodity rate." According to CIG, off-system transportation incurs lower costs, and it "represents new, incremental business that will absorb a share of systemwide costs and benefit all other customers."[23]
 
 
 47
 CIG claims the evidence submitted by CIG and the Commission staff "fully supported the very obvious class of service and cost distinction between 'off-system' transportation business which is truly 'incremental,' and transportation to on-system markets historically served by CIG (i.e., 'sales displacement' transportation)." Furthermore, it claims "[t]here was no evidence submitted in opposition to this rate design." CIG bears the burden of proving the reasonableness of its proposed rate increase. But CIG has directed us to no evidence that "fully supports" the rate differential, and we have discovered none.[24]
 
 
 48
 The ALJ concluded that on- and off-system service "appear[ ] to be comparable." According to FERC and CIG, the ALJ consequently required that the rate charged for on-system service equal that charged for off-system transportation, thus lowering the on-system rate from 36cents to 31cents. However, we can find no indication in the ALJ's decision nor in FERC Opinion No. 290 or 290-A that FERC affirmatively lowered the rate for on-system transportation below its level prior to CIG's proposed rate increase (i.e., 36cents). Moreover, arguments presented by intervenor Big Horn Fractionation Co. (Big Horn), upon which the ALJ relied heavily, urged only that the on-system rate be returned to the prior 36cents level.[25]
 
 
 49
 The ALJ devoted one-and-a-half pages of an eighty-page opinion to the transportation rate issue. 35 FERC p 63,043, at 6767-68. FERC summarily affirmed the ALJ's decision in Opinion No. 290, 41 FERC at 61,454; upon CIG's request for rehearing, it allotted one page of discussion to the issue in Opinion No. 290-A, 43 FERC at 61,272-73. CIG faults FERC for affirming the ALJ's decision on this issue "without discussion of the true cost incurrence and cost responsibility difference." The pipeline concludes the ALJ and FERC orders are "completely unsupported and arbitrary and capricious."
 
 
 50
 In the hearing before the ALJ, CIG and the FERC staff apparently agreed that the on-system transportation rate should "equal the non-gas component of the sales rate ... in order to allow CIG to be economically indifferent as to whether it sells or transports gas." Thus, the FERC staff initially favored CIG's proposed rate increase; however, it subsequently reversed its position and now supports the ALJ's decision.
 
 
 51
 The ALJ concluded that the proposed rate "has not been shown to be just and reasonable particularly, in light of the continuation of the much lower rate for what appears to be comparable service under [the off-system rate]." The ALJ relied heavily on arguments made by Big Horn (predecessor of Western Gas Processors, Ltd.), an intervenor in the rate proceeding. Big Horn argued that CIG had not adequately justified the requested rate change and that it should be required to refile a rate that would recover only CIG's transmission costs. The ALJ found Big Horn's position had merit and rejected the proposed increase.
 
 
 52
 As the proponent of the rate change, CIG bears the burden of demonstrating that it is just and reasonable. But CIG's arguments are based largely on conjecture and appear flawed as a matter of logic. As Big Horn argued to the ALJ, "[i]t seems incredible ... that [CIG] would burden interruptible ... service [customers] with the fixed costs for production, gathering, and storage as per the ... sales rate (for firm service)." And FERC points out that CIG makes inconsistent arguments with respect to transportation rates. In a portion of its rate case not appealed here, it urged that storage costs should not be included in transportation rates, yet it makes the opposite argument here.
 
 
 53
 In contrast to CIG's presentation on this issue, Big Horn offered extensive arguments opposing the change. The ALJ was persuaded by those arguments, and FERC concurred. We must agree that CIG has not borne its burden of persuasion on this issue.
 
 
 54
 We hold only that CIG has not demonstrated that its proposed 60.95cents rate for on-system transportation is reasonable; thus, we affirm FERC's rejection of the rate increase. Despite FERC's and CIG's contrary interpretations in their briefs, we do not read the ALJ's decision or either of FERC's orders as establishing an on-system transportation rate of 30.63cents, the rate CIG proposed for off-system service. The ALJ found only that the two classes of service were "comparable," not that they were "equal."[26] No party to the FERC proceeding argued that the rates for the two types of service should be equal, nor did any party object to CIG's proposed off-system rate. In the absence of any evidentiary basis for reducing the on-system rate below the prior systemwide level of 36cents, we construe FERC's orders as rejecting the on-system rate increase, restoring the 36cents systemwide transportation rate, and ordering appropriate refunds.[27] If FERC wishes to reduce this rate to the EUS-2 level (30.95cents), it may do so only according to the procedures specified in 15 U.S.C. Sec. 717d and regulations promulgated thereunder.
 
 
 55
 Lastly, CIG claims that, even if FERC's rate design is upheld, it should not be applied to certain transactions for which FERC has issued certificates of "public convenience and necessity." 15 U.S.C. Sec. 717f. FERC terms this "an impermissible collateral challenge to Commission-issued certificates that never were appealed and now are final." The certificates, each of which included a "fully compensatory, cost recouping, sales displacement rate, such as the EUS-1 Rate (i.e., 61cents/Mcf)," were issued "subject to the outcome" of this rate proceeding. CIG states that the specific transactions covered by these certificates "were not even subject to Rate Schedule EUS-1, and that the rate provided in that rate schedule was merely referenced by CIG and the Commission as a 'shorthand' for a fully compensatory, sales displacement, transportation rate."
 
 
 56
 FERC argues that the "subject to the outcome" condition, which was included in each of the certificates, requires that the on-system rate ultimately found to be just and reasonable in this case becomes the rate applicable to each certificate. Upon CIG's request for rehearing of FERC's EUS-1 decision, FERC held that this rate proceeding "is not the appropriate forum to discuss the effects of the conclusions with respect to the EUS-1 rate on other issues [i.e., the certificates] in other dockets." Opinion No. 290-A, 43 FERC p 61,089, at 61,273 n. 7. In responding to the issue now raised by CIG, FERC declares: "This Court's analysis therefore comes to an end once it affirms the decision of the Commission to lower CIG's EUS-1 on-system transportation rate."
 
 
 57
 Neither party has provided us with copies of these certificates; thus we are unable to review the precise language of the disputed condition. Moreover, CIG did not even identify to FERC the specific certificates that warranted rehearing. Opinion No. 290-A, 43 FERC p 61,089, at 61,273 n. 7. Although it appears that CIG has now identified those certificates, we will not review them or the related proceedings de novo. Therefore, we cannot say that FERC's determination that "CIG should raise those issues in the relevant certificate proceedings" is unreasonable.
 
 
 58
 AFFIRMED.
 
 
 
 *
 The Honorable Howard C. Bratton, Senior Judge, United States District Court for the District of New Mexico, sitting by designation
 
 
 [1]
 Three other issues asserted in CIG's Opening Brief have been mooted by subsequent developments and were relinquished by CIG prior to oral argument in the case
 
 
 [2]
 This opinion deals with one of four petitions for review of these FERC orders which were filed in this court. An opinion in Natural Gas Pipeline Co. of America v. FERC, 904 F.2d 1469 (10th Cir.1990), is also being filed today. Two other suits, Nos. 88-2191 and 88-2784, were dismissed by the parties prior to argument
 
 
 [3]
 CIG's (and most pipelines') sales rates consist of two parts: A demand charge, which recovers a portion of fixed costs, is paid on all contracted volumes, regardless of the amount of gas actually purchased. The commodity charge, which covers remaining costs and all variable costs, is paid only for volumes of gas actually sold. Variable costs consist principally of the cost of the gas itself, while fixed costs (at issue in this case) include production and gathering costs and the return on equity and certain associated taxes. FERC ruled in 1984 in Opinion No. 380 that the collection of variable costs through minimum bills is not just and reasonable
 The contract in issue here originally required NGPL to pay the full contract price for 90% of its entitlement, but after Opinion No. 380 was issued, FERC modified the minimum bill provision to eliminate the recovery of all variable costs. This court reviewed FERC's modification of CIG's minimum bill in Colorado Interstate Gas Co. v. FERC, 791 F.2d 803 (10th Cir.1986), cert. denied, 479 U.S. 1043, 107 S.Ct. 907, 93 L.Ed.2d 857 (1987). In this case CIG objects to FERC's attempt to eliminate the minimum bill altogether and to limit the fixed costs otherwise recoverable by CIG.
 
 
 [4]
 Retention of a minimum bill is appropriate, even if it has anticompetitive effects, if it meets any one of three factors (the Seaboard factors) that have been identified by the Commission:
 [A] minimum bill may be justified as a means of protecting the pipeline against the risk of not recovering the fixed costs in the commodity component[,] ... a means of protecting full requirements customers from bearing a disproportionate share of the fixed costs resulting from swings off the system by partial requirements customers[, a]nd ... as a means of protecting customers from take-or-pay liabilities the pipeline might otherwise incur.
 
 
 [41]
 FERC p 61,179, at 61,476 (quoting Seaboard factors as discussed in FERC opinion in Transwestern Pipeline Co., 32 FERC p 61,009, at 61,031 (1985), aff'd, 820 F.2d 733 (5th Cir.1987)). The D.C. Circuit has interpreted In re Atlantic Seaboard Corp. to provide that a minimum bill "may be justified if 'specifically designed to achieve [one of the stated remedial ends], but nothing more.' " Panhandle Eastern Pipeline Co. v. FERC, 881 F.2d 1101, 1113 (D.C.Cir.1989) (quoting Mississippi River Transmission Corp. v. FERC, 759 F.2d 945, 950 (D.C.Cir.1985))
 
 
 [5]
 Kansas Gas cites NLRB v. Bell Aerospace Co., 416 U.S. 267, 290-95, 94 S.Ct. 1757, 1769-72, 40 L.Ed.2d 134 (1974), and FPC v. Texaco, Inc., 377 U.S. 33, 84 S.Ct. 1105, 12 L.Ed.2d 112 (1964), for the familiar principles that "an agency may articulate its general policy in a particular proceeding ... rather than in a rulemaking," and that an agency "may apply its reasoned analysis of an issue to guide its disposition of individual cases." 758 F.2d at 719
 
 
 [6]
 The D.C. Circuit reached a similar conclusion in East Tennessee when it stated that "testimony about the effects of the full-cost minimum bill constitutes substantial evidence supporting the Commission's prediction that the fixed-cost minimum bill will also produce anticompetitive results." 863 F.2d at 938 (emphasis in original)
 
 
 [7]
 FERC's determination in Transcontinental Gas that "a traditional fixed cost minimum bill usually restrains competition and is presumptively unjust and unreasonable," 40 FERC p 61,188, at 61,590 (1987) (Opinion No. 260-A), was based on three factors it considered "common to every case given the current market": First, that gas supplies currently exceed demand; second, that where supplies exceed demand, a "minimum bill by its very nature forecloses competition"; and third, the likely effect of a minimum bill is to "make it 'uneconomic to purchase on a least cost basis.' " Id. at 61,589-90 (citation omitted). FERC explicitly or implicitly subscribes to these factors in this case
 
 
 [8]
 CIG asserts that "allowing NGPL to keep its competitor (CIG) obligated to maintain sales service to it" when NGPL intends to purchase no gas is itself anticompetitive and should have been considered by the Commission
 
 
 [9]
 We note, however, this claim more appropriately fits under CIG's second line of reasoning, which argues that the minimum bill, even if anticompetitive, is necessary. Indeed CIG raises the claim again in its discussion of the second Seaboard factor
 
 
 [10]
 Since Wisconsin Gas the D.C. Circuit also has affirmed FERC decisions to eliminate a company's minimum bill altogether. E.g., Tennessee Gas Pipeline Co. v. FERC, 871 F.2d 1099 (D.C.Cir.1989); East Tennessee; cf. Trunkline Gas Co. v. FERC, 880 F.2d 546 (D.C.Cir.1989). In Trunkline Gas, it held that "a pipeline with an MFV rate design [does] not require a minimum bill to avoid such disproportion [between full and partial requirements customers]." Id. at 550 (citing East Tennessee, 863 F.2d at 940)
 
 
 [11]
 On cross-examination, an NGPL witness stated: "I don't necessarily agree with you that it is correct to say that $3.21 [per Mbtu] is higher than $3.25 [sic] ... because I think there are other considerations that have to be taken into account."
 
 
 [12]
 See factors listed in note 4 supra
 
 
 [13]
 The Commission also claims that under the modified fixed-variable (MFV) rate design (which FERC, as a result of this rate-making proceeding, ordered CIG to adopt), "a minimum bill to assure recovery of fixed costs is unnecessary." Opinion No. 290, 41 FERC p 61,178 at 61,466. What the Commission apparently means by this is that the demand charge, which NGPL pays under the MFV rate system, contains those fixed costs that FERC has determined are properly recoverable. The recovery of other fixed costs (e.g., return on equity) should not be guaranteed; thus, a minimum bill is "not necessary."
 
 
 [14]
 Transwestern Pipeline reached a similar conclusion, and the circuit and FERC in that case explained their reasoning somewhat more thoroughly. The court stated:
 [T]he Commission based its finding on the anti-competitive impact of Transwestern's fixed-cost minimum bills on a prediction of how those minimum bills would operate in the future in markets served by Transwestern.
 The Commission based this prediction on evidence in the record, its knowledge of the industry, and common sense. Specifically, the Commission identified three factors. First, gas supplies ... in the [relevant markets] had exceeded demand for the past few years, and the oversupply was likely to continue. Second, the Commission analogized this situation to the treatment of requirements contracts under antitrust law. Where supply exceeds demand, a requirements contract by its very nature forecloses competition.... Third, the Commission observed that a fixed-cost minimum bill would continue to compel a customer to buy gas from Transwestern rather than from a lower-cost competitor.
 820 F.2d at 740.
 CIG argues Transwestern is not applicable here because it is not necessary to predict the impact of CIG's minimum bill; it is apparent from NGPL's recent practice of purchasing higher priced gas from other companies that the minimum bill does not have anticompetitive effects.
 We have already confessed to being puzzled by NGPL's purchasing practices, but noted testimony by NGPL suggesting other factors besides price motivate a gas company's choice of supplier. See supra text at 1462. We will not speculate as to the reasons for NGPL's purchasing decisions or the likelihood of its future purchasing patterns. We can safely assume, however, that FERC's "common sense" and "knowledge of the industry," 820 F.2d at 740, do not vary from case to case with respect to the same ratemaking issue. These are persuasive factors here as they were in Transwestern.
 
 
 [15]
 FERC claims that none of the factual assumptions underlying CIG's claim that it would not be able to compete effectively for other gas sales is supported by record evidence
 
 
 [16]
 FERC noted that, in CIG's rehearing request, "CIG did not specifically claim ... that its minimum bill is needed to protect full requirements customers from bearing a disproportionate share of the fixed costs." Opinion No. 290-A, 43 FERC p 61,089, at 61,278 n. 33. CIG has raised the issue here, however
 
 
 [17]
 FERC states in its brief that "the Commission identified an additional benefit--the increased ability of CIG to compete for transportation service in an effort to recoup lost sales revenue" (citing 41 FERC at 61,466). It is not clear to us, however, whether FERC construed this as a "benefit" of eliminating the minimum bill, or merely an additional mechanism CIG could employ in attempting to offset its lost income
 
 
 [18]
 The petitioner in Tennessee Gas Pipeline Co., in arguing that its minimum bills satisfied the second Seaboard test, claimed that its partial requirements customers had reduced their purchases to substantially less than their entitlements. The D.C. Circuit rejected this evidence as "not probative under the second justification since it relates to drops in volume experienced while Tennessee had a minimum bill in place; it therefore indicates nothing about how elimination of the bill would itself cause a drop." 871 F.2d at 1105 n. 8. We reject CIG's attempt to use evidence concerning NGPL's reduced purchases in the same way here
 
 
 [19]
 FERC explains that most interstate pipelines enter into contracts with producers whereby they agree to pay for a minimum volume of gas, even if not actually taken. If a pipeline's own sales decrease, it can "find itself unable to take enough gas from its supplier to meet its contractual take-or-pay obligations."
 
 
 [20]
 FERC notes in footnote 35 of Opinion No. 290-A that CIG's minimum bill is not designed solely to remedy its take-or-pay problem, as required to satisfy the third Seaboard test. The D.C. Circuit has interpreted In re Atlantic Seaboard Corp. to provide that a minimum bill "may be justified if 'specifically designed to achieve [one of the stated remedial ends], but nothing more.' " Panhandle Eastern Pipeline Co. v. FERC, 881 F.2d 1101, 1113 (D.C.Cir.1989) (quoting Mississippi River Transmission Corp. v. FERC, 759 F.2d 945, 950 (D.C.Cir.1985))
 
 
 [21]
 The D.C. Circuit in Tennessee Gas recognized the pipeline company's "not ... insubstantial" concern about the general need for a minimum bill in its rate structure in light of its own take-or-pay liabilities, and noted FERC's " 'insouciance on take-or-pay.' " 871 F.2d at 1106 (quoting 824 F.2d at 1044). The court admitted to being "concern[ed] about FERC's unwillingness to meet the take-or-pay challenge head-on ...," but was "relieved by [FERC's] actions [relevant to take-or-pay] in other proceedings." Id. Interestingly, the court concluded that as a result of those proceedings, particularly FERC's Order No. 500, 52 Fed.Reg. 30,334 (1987), the third Seaboard factor probably "will retain little vitality in the future." 871 F.2d at 1106. The Fifth Circuit recently has gone even farther, calling minimum bills "unsalvageable by the In re Atlantic Seaboard factors when the MFV design is used." Texas Eastern Transmission Corp. v. FERC, 893 F.2d 767 (5th Cir.1990)
 FERC's interim rule in Order No. 500 was vacated and remanded by American Gas Ass'n v. FERC, 888 F.2d 136 (D.C.Cir.1989). Pursuant to the court's judgment, FERC promulgated a final rule on Dec. 21, 1989. 54 Fed.Reg. 52,344. The final rule continued the take-or-pay crediting regulations adopted in Order No. 500, with two modifications. Id. Several producers and pipeline operators filed petitions for review of the Commission's revised order, and the D.C. Circuit again vacated and remanded in Associated Gas Distributors v. FERC, 893 F.2d 349 (D.C.Cir.1989).
 
 
 [22]
 There is some confusion as to what FERC actually did--set one rate applicable to both types of service, or simply reject the proposed increase for on-system service. We conclude it did the latter. See our discussion in the text infra
 
 
 [23]
 FERC points out that much of CIG's presentation in favor of the rate increase is made "belatedly"--in its brief on appeal, rather than before the ALJ
 
 
 [24]
 Counsel for an intervenor in the FERC proceeding asked a witness for the FERC staff where in the record "anyone interested in trying to understand the rate increase" would look. The FERC staffer admitted it was "a valid question," but stated "it's a little bit difficult," and ultimately could point to no record evidence. He suggested that explanations relevant to the rate increase were in a portion of CIG's filings that FERC had rejected
 
 
 [25]
 Later, however, Big Horn's successor, Western Gas Processors, Ltd., stated that the ALJ and the Commission "concluded that under the non-discrimination requirement of Section 4 of the [Natural Gas Act], the two rates had to be equal." According to Western Gas, FERC thus ordered CIG to charge 31cents for all transportation service. As discussed in the text, we do not reach the same conclusions
 We also note that this case involved other transportation rate issues that were not appealed to this court. In one instance the ALJ approved the inclusion of storage costs in a transportation rate; in another, he disallowed such costs. This would seem to refute Western's assertion that the "non-discrimination" provision "requires" that rates be equal.
 
 
 [26]
 The ALJ stated simply that the "increase in the EUS-1 rate from 36 cents to 60.95 cents ... has not been shown to be just and reasonable particularly, in light of the continuation of the much lower rate for what appears to be comparable service under EUS-2."
 
 
 [27]
 CIG's EUS-1 and EUS-2 rates went into effect subject to refund (i.e., subject to FERC's eventual determination as to the rates' reasonableness) on September 28, 1985. Accordingly, pursuant to our disposition of this appeal, CIG must make refunds based on the on-system transportation rate of 36cents for the period during which the 60.95cents rate was in effect. See FERC Opinion No. 290-A, 43 FERC at 61,273